COLUMBIA OIL AND GAS COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 90624. Promulgated January 10, 1940.

*J. P. Jackson, Esq.*, for the petitioner.
*Carroll Walker, Esq.*, and *Irene Feagin, Esq.*, for the respondent.

## OPINION.

BLACK: *Issue 1.*—Petitioner contends that the respondent erred in his computation of profit in arriving at a "Net remaining cost in leases sold" of $355,940.79 instead of $379,897.78. The parties by stipulation have narrowed this issue to whether the transfer of the oil properties by the Rush brothers to petitioner on May 4, 1931, was a taxable or a nontaxable transaction. This depends upon the effect of section 112 (b) (5) and (j) of the Revenue Acts of 1928 and 1932, which are identical and are as follows:

SEC. 112. RECOGNITION OF GAIN OR LOSS.

(a) GENERAL RULE.—Upon the sale or exchange of property the entire amount of the gain or loss, determined under section 111, shall be recognized, except as hereinafter provided in this section.

(b) EXCHANGES SOLELY IN KIND.—

\*       \*       \*       \*       \*       \*       \*

(5) TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR.—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and

immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange.

\*　　　　\*　　　　\*　　　　\*　　　　\*　　　　\*　　　　\*

(j) DEFINITION OF CONTROL.—As used in this section the term "control" means the ownership of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of the corporation.

Since this issue concerns the determination of the proper "basis" to be used in computing the gain from the sale to Stanolind in 1933 of the oil properties transferred to petitioner by the Rush brothers solely in exchange for stock at the time of petitioner's organization, we arrive at the present consideration of the above quoted provisions of section 112 by having first considered in the order named the following provisions of the Revenue Act of 1932, namely, section 111 (a); 113 (b); 113 (a); and 113 (a) (8).

Petitioner contends that the persons who in 1931 transferred property to it solely in exchange for petitioner's stock were not in "control" of petitioner "immediately after" the exchange, and that, therefore, section 112 (b) (5) is not applicable in deciding this issue. The respondent contends otherwise.

The dispute between the parties arises in connection with the 475 shares that were issued to Todd and the 75 shares that were issued to Knight. The respondent contends that since these shares, with the exception of two qualifying shares, were first issued to the Rush brothers, we must consider the Rush brothers as being in control of petitioner immediately after the transfer to petitioner of the oil properties at the time of petitioner's organization, and that it is immaterial that the Rush brothers later, on the same day, May 7, 1931, transferred these shares to Todd and Knight.

We do not think the transfer of the 550 shares to Todd and Knight can be so disregarded in deciding this issue. This transfer was not a separate and independent transaction, but was an essential part of an integral plan. For income tax purposes this plan must be treated as a single transaction; the component steps thereof may not be treated separately; and control must be determined as of the completion of the plan. *Halliburton* v. *Commissioner*, 78 Fed. (2d) 265; *Bassick* v. *Commissioner*, 85 Fed. (2d) 8; *Hazeltine Corporation* v. *Commissioner*, 89 Fed. (2d) 513; *Commissioner* v. *Schumacher Wall Board Corporation*, 93 Fed. (2d) 79; *United Light & Power Co.*, 38 B. T. A. 477; affd., 105 Fed. (2d) 866; *Sam Pickard*, 40 B. T. A. 258.

Since the decision of *Halliburton* v. *Commissioner, supra,* we have held that the word "property" as used in section 203 (b) (4) of the Revenue Acts of 1924 and 1926, and section 112 (b) (5) of the Rev-

enue Acts of 1928 and 1932 (all of which provisions are identical except for the subtitle "Transfer to Corporation Controlled by Transferor" contained in the 1928 and 1932 Acts) includes money. *Claude Neon Lights, Inc.*, 35 B. T. A. 424, 430; *Cyrus S. Eaton*, 37 B. T. A. 715. Therefore, in applying section 112 (b) (5), *supra*, to the facts in the instant proceeding the cash paid in for stock must also be considered along with the oil properties paid in for stock by the Rush brothers for the purpose of determining whether "immediately after the exchange" the transferors of the property transferred to petitioner pursuant to the plan were in "control" of petitioner within the meaning of that term as defined in section 112 (j). Todd and Knight did not transfer any property to petitioner in exchange for their stock. The only property transferred to petitioner solely in exchange for stock was transferred by the Rush brothers and the cash subscribers, who, upon the completion of the plan only owned 1,450 out of 2,000 shares, or 72.5 percent of petitioner's outstanding capital stock. Since this is less than the 80 percent required by section 112 (j), *supra*, it follows that the transferors were not in "control" of petitioner "immediately after" the exchange; that it thus becomes unnecessary to determine whether the amount of stock received by each transferor was substantially in proportion to his interest in the property prior to the exchange (cf. *United Carbon Co. v. Commissioner*, 90 Fed. (2d) 43); that the entire amount of the gain or loss realized in 1931 upon the transfer of the oil properties by the Rush brothers to petitioner was recognizable at that time; and that the transaction was, therefore, a taxable transaction.

The respondent, in support of his contention that the transfer of the oil properties by the Rush brothers to petitioner was a nontaxable transaction, cites *Schmieg, Hungate & Kotzian, Inc.*, 27 B. T. A. 337; *American Compress & Warehouse Co. v. Bender*, 70 Fed. (2d) 655; *Charles W. Nudelman*, 35 B. T. A. 28; and *J. Hampton Hoult*, 24 B. T. A. 79. The *Schmieg* case turned on whether the petitioner in that case had met the burden of proving that Hungate, immediately after the transfer of the partnership assets, was the owner of one-third of petitioner's common stock. We held that the petitioner had not met that burden and that, therefore, immediately after the exchange the transferors were in control of the corporation. Whether we correctly held in the *Schmieg* case that the proof was insufficient to show that Hungate was the owner of one-third of the common stock of Schmieg, Hungate & Kotzian, Inc., prior to 1929 when it was actually issued in his name, we need not here decide. The important point is that our decision in that case turned on a lack of evidence as to ownership of stock. We have no lack of evidence in the instant case as to the ownership by Todd and Knight of the stock in petitioner which was issued to them on the first day

of the organization of the corporation in pursuance of the plan. In the *American Compress* case, the contract to sell the 1,813 shares was entered into subsequent to the plan there involved and was not a part of the plan. In the instant proceedings, it was a part of the integral plan that the Rush brothers would transfer the 550 shares immediately to Todd and Knight, all of which was done. We do not regard the other two cases cited by the respondent as in conflict with anything we have decided here. Their facts are clearly distinguishable. On issue 1, we sustain petitioner.

*Issue 2.*—Under this issue, petitioner's first point in its argument is that the respondent erred in including as a part of the "amount realized" (see sec. 111, Revenue Act of 1932) the item labeled in his computation "Fair market value of oil payment received" in the amount of $175,000. This amount represents 50 percent of the maximum of $350,000 which petitioner was to receive from the fractional interests reserved, if, as, and when oil would be produced therefrom. In his brief, the respondent apparently concedes that this treatment was erroneous under the decisions of *Commissioner* v. *Fleming*, 82 Fed. (2d) 324, and *Thomas* v. *Perkins*, 301 U. S. 655, for he no longer argues that phase of the case. A mere reading of the contract of sale and the assignments clearly shows that the $350,000 was not an additional consideration for the sale but represented the maximum amount which petitioner might or might not receive for the fractional parts of the first oil, gas, and other hydrocarbons which it specifically reserved for itself. The buyer did not obligate itself personally to pay petitioner the additional sum of $350,000. Such maximum amount was to be paid petitioner only out of the first runs of petitioner's reserved oil, if, as and when produced. Petitioner did not receive as consideration for the sale any property in addition to the $550,000. We hold, therefore, that the respondent erred in determining that the amount realized from the sale of the properties was $725,000 instead of the cash consideration of $550,000. *Commissioner* v. *Fleming*, *supra; Thomas* v. *Perkins*, *supra.*

The respondent, however, contends that if petitioner's first point in its argument be sustained, as we have just held, then the "basis" of petitioner's property should be allocated between the estate sold and the estate reserved. It has been stipulated that the fair market value of the interest owned by petitioner in the properties immediately prior to the sale was $725,000. From this the respondent argues that since petitioner only received a consideration of $550,000, it must have sold property having a value of $550,000 and reserved property having a value of $175,000, and that, therefore, 175/725 of petitioner's cost basis of the whole property should be allocated to the property reserved and only 550/725 of petitioner's basis should be

considered in determining the gain or loss upon the property that was sold. Following our holding under issue No. 1 that petitioner's adjusted basis is $379,897.78, and our holding under the present issue, No. 2, that petitioner's amount realized on the sale was no more than the cash consideration of $550,000, then, under the respondent's present contention, petitioner's gain on the sale computed under section 111 of the Revenue Act of 1932 would be $243,249.68, computed as follows:

| | | |
|---|---:|---:|
| Amount realized (cash payment received) | | $550,000.00 |
| Deduct: | | |
| Adjusted basis: | | |
| Leasehold | $133,307.78 | |
| Tangible well equipment | 246,590.00 | |
| | 379,897.78 | |
| Less amount allocated to property reserved: | | |
| 175/725 of $379,897.78 | 91,699.46 | |
| Balance allocated to property sold | $288,198.32 | |
| Expenses (stipulated) | 18,552.00 | |
| | | 306,750.32 |
| Taxable gain | | 243,249.68 |

Petitioner's second point in its argument under this issue is that the proper method of determining the gain is to allow petitioner the full return of its cost from the cash received in the year of the sale, and that no part of its basis should be allocated to the property reserved. In other words, petitioner contends that there is no justification for reducing its adjusted basis of $379,897.78 by the amount of $91,699.46, shown in the above computation, or by any other amount, and that the correct amount of its taxable gain is, therefore, $151,550.22, computed by subtracting from the cash received, $550,000, petitioner's entire basis of $379,897.78, together with the expenses of $18,552. In support of this contention, petitioner relies principally upon the cases of *Burnet* v. *Logan*, 283 U. S. 404, and *Rocky Mountain Development Co.*, 38 B. T. A. 1303. The taxpayers in the *Burnet* v. *Logan* case prior to March 1, 1913, and until March 11, 1916, were stockholders in the Andrews & Hitchcock Iron Co., a corporation which held 12 percent of the stock of the Mahoning Ore & Steel Co., an operating concern. They sold their shares of stock to the Youngstown Sheet & Tube Co. for a cash consideration and future payments to be measured by the amount of iron ore produced by the Mahoning Ore & Steel Co. In selling their shares of stock they sold them in their entirety, with no reservations, and they, of course, made no reservation of ore in the Mahoning mine, because they owned none of it. They had no reserved interest in the

iron ore which they could recover by way of depletion. The situation in that respect is altogether different from what it is in the instant case and therefore, we think *Burnet* v. *Logan* is not in point.

In the *Rocky Mountain Development Co.* case, *supra*, among other things, we said:

> The petitioner's oil payment contracts called only for certain payments out of oil in consideration for the equipment sold by the petitioner and did not grant or convey to petitioner an interest in the leases themselves or the oil and gas in place.

On these facts we allowed the taxpayer in that case a full return tax free of his cost basis of the oil payments, but denied any depletion deductions because the taxpayer had no interest in the oil in place which would entitle it to depletion.

We do not think that the two cases last mentioned support petitioner's contention that it is entitled to the full return of its basis in the taxable year without first allocating some part thereof to the property reserved. In neither one of the cases principally relied upon by petitioner did the respective taxpayer reserve out of the property sold any such economic interest as would entitle it to a deduction for depreciation or depletion. In the instant proceeding we think the reservations made by petitioner were unquestionably reservations of such economic interests as would entitle petitioner to depletion under *Palmer* v. *Bender*, 287 U. S. 551; *Thomas* v. *Perkins*, *supra*; and *Cook Drilling Co.*, 38 B. T. A. 291, 296. In the latter case, at page 297, we said:

> When a taxpayer reserves an interest in oil in place, as did petitioner when it sold the Alford and Shaw leases for $65,932.72 to be paid "out of an undivided three-fourths of seven-eighths of the oil and gas produced, marketed, and sold from the leases, etc.", it is entitled to recover its cost by way of depletion and not by way of deduction of the cost of the leases from gross income.

Earlier in the same case we disallowed depletion on the Sonbar Corporation and the Bussa Co. oil payments obtained in consideration for drilling the wells which were to produce the oil, where the driller received no assignment of an interest of the oil in place. We said in this connection:

> * * * The statutory allowance for depletion is predicated upon the receipt of gross income from the operation of oil and gas wells, by one who has a capital investment in the oil and gas in place and may not be allowed to one who has no such capital investment but only an income derived from production, through a contractual relation or personal covenant with the owner of the mineral deposit. *Helvering* v. *Bankline Oil Co.*, 303 U. S. 362; *Helvering* v. *O'Donnell*, 303 U. S. 370; *Helvering* v. *Elbe Oil Land Development Co.*, 303 U. S. 372.

In the instant proceeding petitioner had a capital investment in the oil and gas in place, and reserved certain fractional parts of that capital investment until certain maximum amounts would be re-

covered out of future production. Under such circumstances, petitioner's cost allocable to the interests reserved must be recovered by way of depletion and not by way of deduction of the entire cost from the cash consideration of $550,000. *Cook Drilling Co., supra*, as to the Alford and Shaw lease payments there involved. If petitioner were permitted to deduct the entire cost of $379,897.78 during the taxable year in computing the profit on the sale of the leases, and were also permitted to deduct depletion as it receives the future oil payments, it would to that extent be receiving a double deduction, which is not permissible. Cf. *Signal Gasoline Corporation*, 30 B. T. A. 568, 571; affd., 77 Fed. (2d) 728; certiorari denied, 296 U. S. 657. A simple illustration in this regard will illustrate what we mean. Assuming that petitioner's oil payments in the instant case pay out, then petitioner's allowable deductions for percentage depletion will be $27\frac{1}{2}$ percent of $350,000 or $96,250. That is $47,486.01 in excess of the $48,763.99 cost which we have allocated herein to the portion of the leaseholds retained. That result will be all right because it is sanctioned by statute. Percentage depletion may greatly exceed the cost. But suppose we should grant petitioner's request and allow it a full return of its entire cost out of the $550,000 cash received without allocating any part of the cost to the portion of the leaseholds retained. Then it would mean that petitioner would still receive $96,250 percentage depletion on the oil payments, with no remaining costs whatever to recover. We do not think Congress ever intended such a result. Petitioner's second point in its argument under this issue is, therefore, disapproved.

Petitioner's third point in its argument under this issue is by way of a first alternative and is that, in any event, the full adjusted cost of the tangible well equipment in the amount of $246,590 must be returned to petitioner out of the cash received, and that any allocation of leasehold costs as between oil sold and oil reserved must be made on the basis of the number of barrels of oil in the ground required to liquidate petitioner's oil reservation, citing in this latter connection, *Ortiz Oil Co.*, 37 B. T. A. 656. We agree with petitioner that the full adjusted cost of the tangible well equipment in the amount of $246,590 must be returned to petitioner out of the cash received, and that the respondent is in error in contending that part of the adjusted basis applicable to the tangible well equipment must be allocated to the property reserved. The contract and the assignments clearly show that petitioner parted with all of its title to the tangible well equipment. It did not reserve any part of this property. Its reservations were limited only to the first oil, gas, and other hydrocarbons produced, saved, and sold from certain fractional interests in the oil leases until certain maximum amounts had been received. After the sale, petitioner would no longer be entitled to

deduct depreciation on any part of this equipment. That right then belonged to Stanolind.

An examination of the contract of sale and the assignment of the eight leases shows that petitioner sold to Stanolind, for $550,000 cash, (1) all of petitioner's interest in the personal property and equipment on the eight leases used in connection with the development and operation of said leases; title to all of petitioner's interest in said personal property to rest in Stanolind without condition, lien or reservation; and (2) all of petitioner's right, title and interest in, to, and under the said eight leases except one-fourth of seven-eighths of the first oil, gas, or other hydrocarbons produced, saved and sold from tracts 1 to 5, and one-eighth of seven-eighths from tract 6, and one-sixteenth of seven-eighths from tracts 7 and 8, until the total sum of $350,000 was realized. Thereafter the entire interest in the 8 leases was to belong to Stanolind. No interest in the personal property and equipment was reserved to petitioner. The first part of petitioner's third point is sustained.

The second part of petitioner's third point concerns the proper allocation of the adjusted basis of the leaseholds in the amount of $133,307.78 as between the portion sold and the portion reserved. As previously stated, the respondent's contention is that 175/725 of the entire cost basis of $379,897.78, the cost of the leases, plus the cost of the oil equipment, should be allocated to the oil payments reserved. Petitioner contends that if an allocation is to be made no more than 350,000/4,453,750 of the $133,307.78 should be allocated to the oil payments reserved for the reasons that it was stipulated that the estimated number of barrels necessary to return to petitioner its reservations under the assignments to Stanolind was 350,000 barrels; that the estimated number of recoverable barrels of oil in the ground owned by petitioner prior to the sale was 4,453,750 barrels; and that this method of allocation was adopted by the Board in *Ortiz Oil Co.*, *supra*. The formula of allocation, following the *Ortiz Oil Co.* case, would apparently yield results as follows:

$$\frac{350,000}{4,453,750} \times \$133,307.78 = \$10,476.05 \text{ (cost to be allocated to oil payments reserved.)}$$

The remainder of the adjusted cost of the leases would be allocated to the portion of the leases sold. This would result in an allocation of $122,831.73 cost to the portion of the leases sold. It seems to us that this sort of allocation results in too much of the cost being allocated to the part of the leases sold and too little to the portion reserved. Under petitioner's method, only $10,476.05 of the cost basis would be allocated to oil payments having a face value of $350,000.

Under Texas law, oil and gas leases are real property. *Stephens County* v. *Mid-Kansas Oil & Gas Co.*, 113 Tex. 160; 254 S. W. 290;

*Texas Co.* v. *Daugherty*, 107 Tex. 226; 176 S. W. 717. One method of allocating cost between real estate sold and real estate retained, both being parts of the same tract, is by apportioning the cost in proportion to the respective values of the part sold and the part reserved. Cf. *J. S. Cullinan*, 5 B. T. A. 996. The Commissioner has a regulation prescribing the method of allocating costs between lots of real estate which have been subdivided from a larger tract. That regulation prescribes simply that "the cost or other basis shall be equitably apportioned." See art. 61, Regulations 77 (Revenue Act of 1932). The Commissioner has no regulation which deals specifically with the situation in the instant case, but nevertheless we think there must be an equitable apportionment of cost and such an equitable apportionment will naturally depend upon the facts in each case.

We think petitioner's second alternative contention suggests an equitable apportionment of costs in the instant case. That suggestion is that the total cost of the leases, exclusive of the cost of the depreciable propery sold, be allocated on the basis of the relative values of the interests in leases sold, and retained.

It is stipulated that the value of all the properties, including the equipment, at the time of the sale, was $725,000. The equipment was worth $246,590, this being their depreciated cost. Thus, the leases, without the equipment, are to be valued at $478,410. The purchaser paid $550,000 for the equipment and part of the oil rights. Since the taxpayer should have a full return of its equipment cost, and since the price was presumably arrived at on a basis of depreciated cost of this equipment, we are justified in assuming, we think, that of the total consideration, $246,590 was consideration for the equipment. This means that $303,410 represents the agreed value of the interest in oil sold. Since, as stated above, the full oil rights had a value of $478,410, the taxpayer, on the basis of relative values at the time of sale, has sold 303,410/478,410 of its oil, or .6342 of its oil. Since 100 percent of its oil cost $133,307.78, the cost of .6342 was $84,543.79.

A computation of petitioner's profit according to its second alternative would be as follows:

| | | |
|---|---|---|
| Selling price | | $550,000.00 |
| Cost: | | |
| $\frac{303,410}{478,410}$ of $133,307.78 | $84,543.79 | |
| Equipment | 246,590.00 | |
| | 331,133.79 | |
| Expenses | 18,552.00 | |
| | | 349,685.79 |
| Taxable gain | | 200,314.21 |

This, we think, presents an equitable apportionment of the cost of the leaseholds between the parts sold and the parts retained, and we therefore, approve it.

Petitioner, although advancing the above method as its second alternative, questions its use because it defers a considerable part of the leasehold costs to be recovered out of depletion on future oil runs. The answer to this objection is that it does not appear to allocate to the retained portion of the leases any more than an equitable portion of the total cost of the leases. Petitioner says that the method would work satisfactorily if the properties continue to produce and pay out, but that, in view of the highly contingent and speculative nature of an oil payment, it will frequently mean that a taxpayer will never recover all his leasehold costs by percentage depletion.

We think petitioner's fears in this respect are groundless. Percentage depletion is only availed of when it yields a taxpayer a greater deduction than depletion based on cost. We discussed that phase of the depletion allowance in *Cook Drilling Co.*, 38 B. T. A. at page 297, where we pointed out that "a taxpayer is entitled to a return of his full cost by way of depletion, even though depletion figured on the percentage basis will not yield him that much. * * *" The last clause of section 114 (b) (3) of the Revenue Act of 1932 makes certain that result.

For reasons above stated, we approve petitioner's second alternative in allocating the basis of cost between the portion of the leases sold and the portion retained. It is substantially the same as the method of apportionment advocated by the Commissioner, except that it excludes from the allocation any part of the cost of the tangible, depreciable property which was sold. We have already held that this part of the property was sold in its entirety and, therefore, there is no reason that any part of its cost should be allocated to the cost of the portion of the lease retained.

It is true that in *Ortiz Oil Co.*, *supra*, we used the barrel of oil method in allocating the cost basis, urged by petitioner in its first alternative. However, there was no issue in that case between the parties as to the method of allocation. They had differed on other issues and apparently we made the allocation on the best evidence that was before us and it was accepted by both parties. So far as we can see, it yielded an equitable apportionment of costs in that case. In the instant case, as we have already pointed out, the use of the same formula does not result in an equitable apportionment of the costs and we have rejected it for what we conceive to be a better method under the facts of the instant case.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

ARNOLD, dissenting: I respectfully dissent from the conclusion reached in the majority opinion that cost must be allocated between cash received and contingent future payments in order to determine the amount of gain derived from the sale of property. If apportionment is necessary, or practical, the method used in the majority opinion is, perhaps, better than that used in *Ortiz Oil Co.*, 37 B. T. A. 656, or by the respondent here, but, in my opinion, it is unnecessary to allocate cost in order to properly determine the amount of gain realized from the sale of property herein.

The gain from the sale of property is the excess of the amount realized over the cost basis as adjusted, section 111 (a), Revenue Act of 1932. The amount realized from a sale is the sum of money received plus the fair market value of the property (other than money) received, section 111 (b), Revenue Act of 1932. The amount realized from the present sale was $550,000 cash, and I agree with the majority opinion that petitioner did not receive any additional property as consideration for the sale.

In my opinion the majority's allocation includes, by indirection, $48,763.99 of the fair market value of future oil payments in petitioner's taxable income, although prohibited by the decided cases from including therein the *entire* fair market value of such future oil payments. It seems to me that the same contingency and uncertainty as to the receipt of the future payments exist in apportioning costs as exist in increasing a taxpayer's gross income by the estimated present worth of such contingent future payments. I can see no more justification for its use in apportioning costs than for its use in increasing gross income. The contingent nature of the oil payments remains the same in either event.

In view of the known fugacious nature of oil and the necessarily contingent nature of oil payments to be received from the production of oil, if any, an allocation of cost between cash received and oil payments to be received out of production may result in petitioner's failure to recover $48,763.99 of its costs. If cost be not recovered the taxation of a portion of the cash received as gain realized from the sale would in effect be a tax upon capital and not upon income. *Commissioner* v. *Laird*, 91 Fed. (2d) 498; *Commissioner* v. *Fleming*, 82 Fed. (2d) 324; *Burnet* v. *Logan*, 283 U. S. 404.

In the last mentioned case the respondent valued the right to receive payments for ore extracted as being the equivalent of cash, and used his valuation as the basis for apportioning subsequent annual receipts between income and return of capital. The Supreme Court held that the promise of future money payments was wholly contingent upon facts and circumstances not possible to foretell with anything like certainty and that the promise was in no proper sense the equiva-

lent of cash. The Court's opinion points out that the taxpayer "might never recoup her capital investment from payments only conditionally promised" and that she "properly demanded the return of her capital investment before assessment of any taxable profit based on conjecture."

In the *Fleming* case, *supra*, the court held that in "sales of interests in oil leases a money payment unconnected with production of oil is to be dealt with as representing a conversion of capital by sale * * *."

In the *Laird* case, *supra*, the Fifth Circuit differentiated between oil payments and oil royalties. It held that all payments received on account of the devise of certain "oil payments" were returns of capital until the aggregate capital.sum devised had been recovered, and no question of income would arise until the entire capital value was received. The court pointed out that it would not do to permit the Commissioner to press the analogy between royalty and oil payments "to the point of taxing as income what is inescapably a return of capital."

I do not believe the holding in *Cook Drilling Co.*, 38 B. T. A. 291, at page 297, respecting the Alford and Shaw leases, is authority for the allocation of costs. Those leases were sold for a consideration to be paid out of oil to be produced. No cash, plus oil payments, was involved. This proceeding is therefore factually different on this point.

The majority opinion states the real essence of its argument when it assumes that the oil payments will pay out the $350,000 reserved and further assumes that petitioner will claim the statutory percentage depletion allowance, and then states that, if both assumptions materialize, the petitioner will secure double deductions, totaling $47,486.01 in excess of cost. These assumptions by the majority overshadow all other considerations. The essential facts are that petitioner sold certain property for cash and reserved the right to participate in future production, if any. The right reserved is so conjectural that its fair market value can not be included as a part of the gain realized from the sale, and the practical solution, in my opinion, is to first permit the recovery of cost to the extent of cash received. This solution guarantees that the taxpayer will at least recover his costs to the extent of cash received, and recovery of cost will not be dependent upon a wholly conjectural and contingent possibility. Thus the constitutional inhibition against the taxation of capital as income is preserved.

If tax laws are to be administered in a practical manner and upon an annual accounting basis, this taxpayer has realized gain on the sale of a capital asset in the taxable year only to the extent of the cash received in excess of its cost. Any formula for the allocation

of cost, however, just and equitable it may appear to be, which forces a taxpayer to postpone the recoupment of his investment to the happening of unpredictable future events which may never occur, is a direct violation of the Sixteenth Amendment, and the revenue acts enacted pursuant thereto, which lay a tax upon income and not upon capital.