AMERICAN LIBERTY OIL COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 98487, 98488. Promulgated December 13, 1940.

*John B. King, Esq.*, for the petitioner.
*James H. Yeatman, Esq.*, for the respondent.

OPINION.

DISNEY: These proceedings were consolidated for hearing and report and involve the redetermination of deficiencies of $54,778.42, $723.55, and $97,929.97 in income tax for the respective years 1932, 1933, and 1934, and a deficiency of $13,735.90 in excess profits tax for the year

1934. All of the facts, except those relating to the deductibility of an item of $120,000, were stipulated. The stipulated facts are incorporated herein by reference as our findings of fact on the issues to which they apply. Separate findings of fact will be made on the issue involving the item of $120,000.

The petitioner, a Delaware corporation, was organized on May 28, 1932. In August 1932 and in 1933 it organized under the laws of Delaware the Wofford Production Co. (hereinafter referred to as the Wofford Co.) and the Southern Liberty Oil Co. (hereinafter referred to as the Southern Co.), respectively, both of which are wholly owned subsidiaries of petitioner.

The petitioner and the Wofford Co. filed a consolidated return for 1932. In 1933 the petitioner, the Wofford Co., the Southern Co., and other corporations filed a like return.

### Issue 1.—Income from Oil and Gas Lease.

In January 1931 E. L. Pinkston and his wife executed an oil and gas lease in favor of the Warner-Quinlan Co. (hereinafter referred to as the Warner Co.) on a tract of land in Rusk County, Texas. The lessors reserved a royalty of one-eighth of the oil and gas produced and saved from the premises. As further consideration the lessors were to receive from the lessee a maximum of $31,000 payable only out of and from one-eighth of the seven-eighths of the oil produced, saved, and sold from the leased premises.

In October 1931 the Warner Co. assigned the lease to the Mills Bennett Production Co. (hereinafter referred to as the Mills Co.), in consideration for which the assignee assumed the obligations of the lease and agreed to pay to the assignor the sum of $2,000 for each acre covered by the lease "solely out of one-fourth of the proceeds received by Buyer [Mills Co.] from the sale of its seven-eighths of the oil and/or gas produced, saved and marketed from said leased premises, if, as and when produced."

On August 9, 1932, the Mills Co. assigned the lease, together with seven completed wells, equipment, and personal property in and on the land, to W. M. Wofford in consideration for two notes for $35,000 each, payable in three and six months, respectively, and the assumption of the oil payments to the Pinkstons and the Warner Co. To secure the payment of the notes and the amounts assumed by Wofford, the assignor reserved a vendor's lien against "each and all the leasehold and property hereby conveyed and assigned." There were expressly excluded from the assignment all drilling rigs, drilling rig equipment on the leasehold, and surplus casing and line pipe.

On August 12, 1932, Wofford assigned his interest in the lease and all property thereon to the Wofford Co. subject to the assignment contract of August 9, 1932, between himself and the Mills Co.

In 1932 and 1933 the Wofford Co. made the following oil payments under the lease: In 1932, to E. L. Pinkston and wife, $25,727.65, and to the Warner-Quinlan Co., $27,421.09; in 1933, to the Warner-Quinlan Co., $40,445.27. These amounts were not included in the consolidated returns of the petitioner. In his determination of the deficiencies the respondent included the amounts in gross income of the Wofford Co. and allowed as a deduction for depletion 27½ percent of the amount of the payments. The petitioner alleges that the amounts do not constitute income of the Wofford Co.

The petitioner contends that the question is controlled by *Thomas* v. *Perkins*, 301 U. S. 655, and the respondent relies upon the more recent case of *Anderson* v. *Helvering*, 310 U. S. 404. In the *Perkins* case the oil lease was assigned for cash and $395,000 payable only out of one-fourth of the oil produced and saved from the leased premises. The payment was not a personal obligation of the assignee and the instrument assigning the lease did not purport to reserve a lien. The Court held that the assignment withheld "from the operation of the grant one-fourth of the oil to be produced and saved up to an amount sufficient when sold to yield $395,000." So holding, the assignors of the assignee were held to be taxable on the income from the interest in oil which they reserved in the assignment. In the *Anderson* case there was a conveyance of certain royalty interests, fee interests, and deferred oil payments for cash and $110,000 payable "from one-half of the proceeds received by him [assignee] which might be derived from oil and gas produced from the properties and from the sale of fee title to any or all of the land conveyed." The assignor retained a first lien against " 'that one-half of all oil and gas production and fee interest * * * from which the $110,000 is payable,' the lien and claim 'not in any way [to] affect the one-half interest in all oil and gas production and fee interest or the revenue therefrom which * * * [it] is to have and receive under this agreement.' " In holding that Anderson, as assignee, was taxable upon the gross proceeds of oil produced from the premises, the Court pointed out that the assignor was not dependent upon oil production alone for its deferred payment of $110,000, that payments made from other than oil and gas production would not be entitled to depletion, and that "the reservation of this additional type of security for the deferred payments serves to distinguish this case from *Thomas* v. *Perkins*." As to the force of its decision in the *Perkins* case, it said:

* * * In the interests of a workable rule, *Thomas* v. *Perkins* must not be extended beyond the situation in which, as a matter of substance, without regard to formalities of conveyancing, the reserved payments are to be derived solely from the production of oil and gas. * * *

It is clear from a reading of these cases that, in situations where the lessor's reserved interest is payable only out of production of

oil and gas, the amount attributable to that interest is not income of the lessee, but where the amount may be paid from another source, as, in the *Anderson* case, from the proceeds of sales of the fee title to land conveyed, the gross income from production is taxable to the lessee. The payments in question here were made to the original lessors and their lessee. Were their oil payments to be derived solely from the production of oil and gas? If so, the *Perkins* case governs the issue.

In addition to the usual owner's royalty interest of one-eighth, the Pinkstons, the original lessors, were entitled to receive a maximum of $31,000 "with and from 1/8th of the 7/8ths of the first oil that may be produced, saved and sold by lessee from the leased premises, * * * the obligation to pay said additional consideration, * * * to arise only if, when and as the oil from which same can be made is produced, saved and sold as hereinbefore provided." The assignment contract between the Warner Co., the original lessee, and the Mills Co. contains terms equally as clear that the payment reserved by it, being $2,000 per acre, was to be derived solely out of oil and gas produced. It not only provides that the consideration was payable only out of one-fourth of the assignee's seven-eighths interest in oil and gas produced from the lease, but, to eliminate any doubt as to intent, expressly provides "that the obligation of the Buyer [Mills Co.] to pay the said sum of money is conditioned that the same can be liquidated by the application of one-fourth of the proceeds received by the Buyer from the sale of its seven-eighths of the oil and/or gas produced, saved and marketed from said leasehold." These provisions, without more, bring the case within the *Perkins* case, as clarified by the *Anderson* decision.

But respondent insists that the payments were not payable solely out of oil and gas because the "assignors" had a lien on the equipment on the leasehold for the amount of their payments. In its acquisition of the lease, the Mills Co. agreed to pay the Warner Co., its assignor, $2,000 per acre out of oil and gas production, and assumed the obligations of the lease. Wofford, as the assignee of the Mills Co., gave the latter notes aggregating $70,000, without designating any source of payment, and assumed the oil payments to the Pinkstons and the Warner Co., the assignor reserving a vendor's lien against the leasehold and property assigned by the instrument, as security for the obligations of Wofford. The Wofford Co. acquired the lease subject to the assignment contract between the Mills Co. and Wofford.

We fail to see how the lien reserved by the Mills Co. affects the question in any material way. The payments here involved were made to the original lessor and lessee, neither of which had security

for the payments reserved by them or could derive amounts from any source other than oil and gas production. Amounts payable to them were wholly contingent upon the production of oil and gas. Such benefits as the lien conferred were in favor of the Mills Co., which had no interest in oil and gas production on the lease except to see that its liability to the owners of the land and their lessee was discharged. We are of the opinion that the *Perkins* case governs. Accordingly, it was error for the respondent to include the payments in question in gross income of the Wofford Co. In view of this holding and in accordance with the stipulation of the parties, there should be eliminated as a deduction from gross income of the Wofford Co. the amounts allowed by the respondent as deductions for depletion on the amounts paid on the reserved oil payments.

## Issue 2.—Deductibility of Taxes.

Upon the incorporation of petitioner on May 28, 1932, it acquired in a nontaxable reorganization all of the assets and assumed all of the liabilities of the Golding-Murchison Oil Co. Petitioner's books were kept and its income tax returns filed on the accrual basis. The petitioner accrued on its books in 1932 and subsequently paid state, county, and independent school district taxes of the State of Texas for 1932 on the property acquired in the reorganization.

The question is whether the taxes are deductible from gross income of the petitioner for 1932. In *Texas Coca-Cola Bottling Co.*, 30 B. T. A. 736, we held that like taxes of the State of Texas accrue and become a lien on the property on January 1 each year and that a purchaser of the property thereafter within the tax year may not deduct the amount thereof as taxes paid or accrued within the year, but must add the amount to the cost of the property acquired. The petitioner relies upon *Corondelet Building Co. v. Fontenot*, 111 Fed. (2d) 267, in contending that only five-twelfths of the taxes should be capitalized as part of the cost of the property, and that the remainder is deductible from gross income. The case relied upon by petitioner involved taxes of Louisiana and does not control the question here. Taxes on real property in Louisiana are not a personal liability of the owner and do not become a lien until November 27 of the tax year. In the State of Texas, as we pointed out in the *Texas Coca-Cola Bottling Co.* case, *supra*, taxes are a lien on the property on January 1, and the owner of the property on that date is personally liable for the amount of the taxes. *Cranfill Brothers Oil Co. v. State*, 54 S. W. (2d) 813; *Humble Oil & Refining Co. v. State*, 3 S. W. (2d) 559. The respondent's action in disallowing a deduction for the amount of the taxes was proper.

### Issue 3.—*Profit on Sale of Leases and Equipment.*

On April 18, 1934, the petitioner sold to the Atlantic Oil Producing Co. (hereinafter referred to as the Atlantic Co.), for $1,600,000 cash, certain leasehold interests and equipment used on the leased premises for the production of oil and gas therefrom, excepting from the sale, however, 4,400,000 barrels of oil when, as, and if produced. The contract was carried out in accordance with its terms, except that petitioner received a cash consideration of $1,500,-000 in the sale. On April 18, 1934, third parties held contracts entitling them to receive a total of $1,206,391.17 from the proceeds of the sale of oil if, as, and when produced from the leases. This amount was to be deducted or paid from the 4,400,000 barrels of oil reserved by the petitioner.

The petitioner's interest in the oil reserves in the land covered by the leases was estimated by the respondent to be 19,295,522 barrels as of January 1, 1934. From that date to April 18, 1934, 205,919 barrels of oil were produced from the leases. The fair market value on April 18, 1934, of the 4,400,000 barrels of oil reserved by petitioner, less the sums payable to third parties, was not less than $1,596,804.41.

On April 18, 1934, the depreciated cost of the lease and well equipment thereon was $648,134.05 and the cost of the leaseholds, less depreciation allowed or allowable, was $946,828.01. Legal expenses on titles, commissions, and cost of abstracts incurred by petitioner in connection with the sale were $19,149.96.

The issue is the correct method of computing gain or loss on the sale. All of the factors necessary to make the computation are embodied in the stipulation. Petitioner reported no gain from the transaction, for reasons not apparent from the record. In his determination of the deficiency for 1934, the respondent determined a taxable gain of $706,780.16, by deducting from the cash consideration of $1,500,000, a base of $781,827.13 for the interest sold, plus $11,392.41 for allowable depletion. The base arrived at is the same percentage of the total cost of the leases and lease equipment ($1,614,122.02) as the value of the interest sold ($1,500,000) bears to the total value ($3,096,804.41) of the interest sold and interest retained.

We had a similar question in *Columbia Oil & Gas Co.*, 41 B. T. A. 38, now before the Circuit Court of Appeals for the Fifth Circuit on petitions filed by both parties. The respondent assumes that we will follow that case here and makes no new contentions. Petitioner is satisfied with the result we reached in that case to the extent that the adjusted basis for the lease equipment is deductible in full from the cash received. It contends that no part of the base of the property sold should be allocated to the oil reserved in the sale and that, if the cost of the leases is allocated between the oil sold and the oil

reserved, it should be made in the ratio that the number of barrels of oil reserved bears to the number of barrels of oil sold.

The first point raised by petitioner was considered and rejected by us in the *Columbia Oil & Gas Co.* case, *supra*, and is the same as that advanced by the member dissenting from the decision. We are of the opinion that the conclusion reached by the majority in that case is correct and, accordingly, will follow it here.

The method proposed by petitioner for the allocation of the adjusted basis of the leaseholds between the portion sold and the portion retained on the basis of the oil reserved and oil sold was also considered in the *Columbia Oil & Gas Co.* case and rejected in favor of a method having as its foundation the values of the interests in the leases sold and retained. The plan adopted was regarded as producing more equitable results on the facts of the case than the "barrel" method proposed by the taxpayer.

The ratio of oil reserved to the oil sold is greater here than it was in the *Columbia Oil & Gas Co.* case and the value of the interest in the oil sold in comparison with the value of all of the property sold, less equipment, is about half of the ratio found in that case. While the facts here do not result in as wide a difference between the so-called "barrel" and "value" methods of apportionment as there was in the *Columbia Oil & Gas Co.* case, we think the method applied there should be followed here. Accordingly, the method used for determining gain in that case will be followed here in the recomputation of gain or loss on the transaction under Rule 50.

*Issue 4.—Expense of Sale.*

FINDINGS OF FACT.

On June 1, 1931, the Golding-Murchison Oil Co. agreed in writing to sell and deliver to the pipe lines of the Tyler Pipe Line Co. (hereinafter referred to as the Tyler Co.) such amounts of oil produced from its properties as the latter might desire to purchase. The contract was not recorded. The agreement was assumed by the petitioner in connection with the acquisition of the assets of the Golding-Murchison Oil Co. in May 1932. Petitioner was not in a position to perform its part of the contract after the sale of its property to the Atlantic Co. on April 18, 1934.

A controversy arose between the officers of petitioner and the Tyler Co. as to what should be done about the contract of June 1, 1931, in view of the sale to the Atlantic Co. Negotiations with the Tyler Co. to determine the amount of the liability of petitioner on account of breach of the contract were commenced prior to the sale and continued until April 1936. On April 1, 1936, the Tyler Co. discharged the

petitioner from its obligation under the contract of June 1, 1931, for a consideration of $120,000. On June 30, 1936, the amount of the consideration was entered on the books of petitioner in an account entitled "Sale of Leases—Atlantic." On December 31, 1936, the item was transferred to an account styled "Earned Surplus— Unappropriated 1934."

OPINION.

The petitioner contends that the amount of $120,000 which it agreed on April 1, 1936, to pay to the Tyler Co. constitutes an expense incurred in making the sale to the Atlantic Co. and should be reflected in computing the profit realized therefrom. It insists that liability for damages for default under the contract was incurred in 1934 and was accruable in that year, even though the amount of the liability was not agreed upon until 1936. The argument is based, in part, upon an assumed showing that an agreement was reached prior to the sale that the Tyler Co. would release petitioner from its obligations under the contract; that the Tyler Co. would sustain damages on account of the breach; and that the amount of the damages would be ascertained later. The proof does not go so far. It was realized that a sale of the leases giving the purchaser the right to receive the oil would be a breach of the contract. Negotiations were commenced prior to the sale to settle the matter, including the amount of damages sustained, but no agreement was reached thereon until April 1936, about two years later.

Questions of this sort have been before us in numerous proceedings. Each case must be decided on its peculiar facts. In *Thorne, Neale & Co.*, 13 B. T. A. 490, we said:

\* \* \* The sound rule established is that where the taxpayer acting in good faith disputes the liability and does not enter the item as a liability as of the year in which the transaction occurred out of which the liability arose the taxpayer can not take the deduction in that year but must take the deduction when the liability is finally determined or admitted. \* \* \*

In *Lucas* v. *American Code Co.*, 280 U. S. 445, the taxpayer sought to deduct in its 1919 return the amount of a judgment recovered against it in 1922 on a contested breach of a contract of employment in 1919. The Court said: "Obviously, the mere refusal to perform a contract does not justify the deduction, as a loss, of the anticipated damages. For, even an unquestionable breach does not result in loss, if the injured party forgives or refrains from prosecuting his claim. And, when liability is contested, the institution of a suit does not, of itself, create certainty of loss."

The petitioner relies upon *Automobile Insurance Co.* v. *Commissioner*, 72 Fed. (2d) 265. In that case claims of the taxpayer against

the German Government were allowed by the Mixed Claims Commission in 1928 and the question was whether the amount of the award was accruable as taxable income in 1928, the insurance company being on the accrual basis, or whether taxation should be in subsequent years, when partial payments were made on the award. The court held that the amount of the award was accruable as income in 1928, upon the ground that there was reasonable expectation in that year that payment would be made. No such expectation was shown in *Commissioner* v. *Speyer*, 77 Fed. (2d) 824, affirming 30 B. T. A. 517, under another award by the Mixed Claims Commission, and a different conclusion was reached. The facts here do not justify a finding that in 1934 the Tyler Co. had reasonable expectation of receiving any amount.

The sale of the oil to the Atlantic Co. was a breach of the contract with the Tyler Co. giving rise to a claim for damages. The loss did not, however, occur at that time for the amount of the damages sustained had not been determined until 1936, and at all times prior thereto was in dispute, if not actively contested.

No error was committed by the respondent in refusing to allow the item of $120,000 as a cost or expense in computing the gain realized on the sale of the property.

### Issue 5.—The Question as to Liquidation of the Wofford Production Co.

The Pinkston lease produced oil and gas from the time of its acquisition in August 1932 by the Wofford Co. Upon the transfer of the lease to petitioner on April 1, 1934, for $150,000, the petitioner credited the amount in an intercompany account upon its books to cover transactions with the Wofford Co. The credit left a balance due the Wofford Co. of $146,825.90. The lease had a fair market value of $260,000 on April 1, 1934.

The Pinkston lease was the only operating asset owned by the Wofford Co., and after it was transferred to petitioner there remained as assets of the Wofford Co. cash in the amount of $139.21 and an account receivable of $146,825.90 due from petitioner, and liabilities consisting of a small amount for taxes, which was paid in 1934.

The Wofford Co. has not acquired any assets or conducted any business operations since April 1, 1934. Neither has petitioner paid anything to it on account of the indebtedness of $146,825.90. The franchise taxes of the Wofford Co. since 1934 have been paid by petitioner. The Wofford Co. has not been formally dissolved and its stock has not been canceled.

Since December 31, 1934, the petitioner has paid $4,641.98 in franchise, income and other taxes for the account of the Wofford Co.,

all of which was charged to the Wofford Co. on petitioner's books. The amount paid included Federal income and excess profits taxes of $3,460.56 for 1934, resulting from the sale of the Pinkston lease to petitioner.

The respondent determined in his computation of petitioner's tax liability for 1934 that when the Wofford Co. transferred its sole operating asset to petitioner and discontinued business, the transferor, in substance, "became liquidated." He found that petitioner actually received, in distribution, the sum of $110,000, representing the difference between the fair market value and the recited selling price for the Pinkston lease, and that it constructively received, also as a liquidating dividend, the sum of $146,825.90 owing by it to the liquidating corporation. Article 22 (a)–1 of Regulations 86 was cited by the Commissioner in connection with his action as to the item of $110,000, and petitioner raised no issue respecting the matter. Upon brief it concedes that a profit in that amount was realized by reason of receipt from a wholly owned corporation for $150,000 of property having a fair market value of $260,000. The question for decision is whether the item of $146,825.90 is taxable to petitioner as gain resulting from distributions in liquidation of the Wofford Co.

Upon brief respondent contends that the Wofford Co. was "in substance and in fact liquidated" as effectively as though it had been formally dissolved, notwithstanding the fact that the corporation continued in existence by payment of its franchise taxes. The fact that petitioner held all of its stock and hence had absolute control over the account receivable is stressed by respondent.

This Board has said that the word "liquidation" as applied to a corporation is recognized by textwriters and courts as meaning "the operation of winding up its affairs by realizing its assets, paying its debts and appropriating the amount of profit or loss", and that liquidation of a corporation is "an existing condition brought about by affirmative action, the normal and necessary result of which is the winding up of the corporate business." *W. E. Guild*, 19 B. T. A. 1186. In *Fred T. Wood*, 27 B. T. A. 162, we said with respect to the meaning of the term "liquidation":

* * * There must be a manifest intention to liquidate, a continuing purpose to terminate its affairs and dissolve the corporation, and its activities must be directed and confined thereto. It contemplates an impairment of capital or a retirement of outstanding stock, though a distribution, if one of a series of distributions in liquidation, may be a liquidating dividend even if it, of itself, does not impair capital. Liquidation can not be brought about by mere declaration, and the question of whether a corporation is in liquidation is therefore one of fact. * * *

It has been said that the decisive factor is "whether the distribution was made with the intent to maintain the corporation as a going con-

cern or with the intent to liquidate the business." *Horn & Hardart Baking Co.* v. *United States*, 34 Fed. Supp. 89.

Although respondent's contention here is based upon the theory that the Wofford Co. was liquidated in 1934, his determination of tax liability of petitioner is not strictly in accordance with such argument. As we have already pointed out, instead of treating the Pinkston lease as a distribution in liquidation, he regarded it as a sale by a corporation to a shareholder at a price substantially less than its fair market value, which, therefore, resulted in taxable income to the purchaser under section 22 (a) in an amount measured by the difference between the price paid for the property and its fair market value. Notwithstanding such treatment of the transaction, the alleged gain was included in petitioner's gross income as a liquidating dividend. In determining the tax liability of the Wofford Co. he regarded the transaction as a sale resulting in taxable income to it. The computation of tax liability attached to the deficiency notice contains no indication that he made any deduction for the basis petitioner had in stock of the Wofford Co. or for the outstanding liabilities of the corporation. Neither did he regard the cash of the Wofford Co. as having been distributed, although, as an asset capable of being distributed, its status did not differ from the account receivable.

It is apparent from these observations that the respondent's action in determining the deficiency was at least inconsistent with a finding of complete liquidation, if not arbitrary. Determinations of that sort are not entitled to the same weight before this Board as determinations having a proper foundation. *Helvering* v. *Taylor*, 293 U. S. 507. The question was presented to us upon an agreed statement of facts and our decision must be made upon such facts. *Weaver* v. *Commissioner*, 58 Fed. (2d) 755; *Iowa Bridge Co.* v. *Commissioner*, 39 Fed. (2d) 777; *Norfolk National Bank of Commerce & Trusts* v. *Commissioner*, 66 Fed. (2d) 48.

A somewhat similar situation prevailed in *Walker Products Corporation*, 30 B. T. A. 636. In that case all of the stock of the Charles R. Luker Co. was owned by the Pittsburgh Melting Co., the stock of which and other corporations was owned by a holding company dominated by the same interests. The Charles R. Luker Co. sold its principal asset in June 1924 and took back a purchase money mortgage maturing three years later. During that period the corporation's assets consisted entirely of the mortgage and an account receivable against its stockholder. It did no business in 1925, 1926, and 1927, but was kept alive with the view of acquiring another plant to operate. In 1927 the Pittsburgh Melting Co. gave up the idea of acquiring the plant for its subsidiary and disposed of the mortgage

88

and closed out the account receivable. From these and other facts we held that liquidation occurred in 1927.

A case more in point is *C. M. Menzies, Inc.*, 34 B. T. A. 163, in which there was a disposition in 1931 of all of the corporation's assets to an individual owning 90 percent of the stock for an amount, evidenced by the transferee's note, equal to the net worth of the corporation and an assumption of the corporation's indebtedness. Payments were made on the note at various times thereafter and the note was paid in full in 1935. No steps were ever taken to dissolve the corporation and at the time of the hearing it was still in existence. Such activities as the corporation engaged in after 1931 related to collection of the note and management of the property conveyed to it in part payment thereof. The question was whether the disposition of all the corporation's assets was a sale or a distribution in liquidation. This fact and the fact that the return of the corporation for 1931 stated that it was abandoned after the disposal of its assets was held not to be decisive. In holding that no liquidation occurred in 1931 we emphasized the fact that the corporation had not been dissolved, that no steps had ever been taken to dissolve it, that it had not been abandoned, and that it was still in existence.

Here petitioner owned all of the stock in the Wofford Co., but the point is no more decisive in these proceedings than it was in *C. M. Menzies, Inc., supra*, where the transferee of the corporation's assets owned 90 percent of its stock. *O. Moorshead*, 28 B. T. A. 253. Power to cause the liquidation of a corporation is far removed from an intent to liquidate and liquidation in fact.

Aside from the transfer of the lease, in connection with which petitioner concedes tax liability upon a theory other than partial or complete liquidation, no asset of the Wofford Co. was actually distributed to petitioner. The account receivable was not charged off or otherwise disposed of during the taxable year, and it still constitutes an asset of the Wofford Co. Respondent's determination that the account receivable was received by petitioner in liquidation proceedings rests entirely upon the theory that it was constructively received. The doctrine of constructive receipt must be sparingly applied. *John A. Brander*, 3 B. T. A. 231. No justification appears for its application here.

We conclude that the Wofford Co. was not in liquidation in 1934 and that it was error for respondent to include the item of $146,825.90 in petitioner's gross income as a liquidating dividend.

*Issue 6.—The Question as to Liquidation of the Southern Liberty Oil Co.*

The properties of the Southern Co. consisted of various oil and gas leases in the Conroe Field in South Texas. On November 30, 1934,

it conveyed all of its producing properties to petitioner for a recited consideration of $177,011.93. Prior thereto petitioner made advances to the Southern Co., which were carried on petitioner's books as an account receivable from the Southern Co. On December 31, 1934, the balance due petitioner in the account was $71,194.15.

The respondent treated the sale as a liquidation of the Southern Co. and computed taxable gain thereon of $172,958.88 by valuing the property transferred at $374,970.81 and holding that the excess of the figure over the recited consideration, plus $25,000 as basis for capital stock, was taxable gain. In making the computation respondent did not allow as a deduction the indebtedness of the Southern Co. to petitioner, aggregating $71,194.15.

In computing the consolidated net income of petitioner for 1933, the respondent allowed as a deduction a net loss of the Southern Co. in the amount of $82,740.32.

The Southern Co. was not dissolved in 1934. It is still in existence. For the year 1934 and subsequent years it has paid its franchise taxes and has filed income and capital stock tax returns.

In its petition and amended petition filed herein, petitioner alleged as error the respondent's failure to allow as a deduction in his computation of the liquidating dividend received from the Southern Co. the amount of $71,194.15 for unpaid advances. The prayers, however, ask that the "profit, if any" realized in the transaction be reduced by the balance in the account for advances. The amended answer filed by the respondent admits the allegation of error and requests that there be reflected in the computation of gain the net loss of $82,740.32 sustained by the Southern Co. in 1933, thereby increasing the liquidating profit by $11,546.17 or to $184,505.05 and giving rise to an increased deficiency. Petitioner's reply to the amended answer admits, in effect, that the value of the equipment transferred was $374,970.81, as determined by respondent in his computation of the deficiency. It then alleges that the gain realized was $126,764.43, computed as follows:

| | | |
|---|---:|---:|
| Value of property transferred | | $374,970.81 |
| Less: | | |
| Advances | $71,194.15 | |
| Consideration paid for property | 177,011.93 | |
| | | 248,206.08 |
| | | $126,764.73 |

Upon brief respondent makes an unconditional statement that the Southern Co. was liquidated and that liquidation was accomplished in the form of a sale of its assets to its sole stockholder. He then proceeds to argue the point raised by his amended answer under the assumption that there is no issue whether a liquidation, in fact, occurred. Petitioner's argument upon brief is merely that except

for the corporation to which the indebtedness was owing, the Southern Co. had the same status as the Wofford Co. at the close of 1934; that if the transfer of operating assets of the Wofford Co. was equivalent to a liquidation; then liquidation occurred here; and that if the indebtedness of petitioner to the Wofford Co. constitutes income to petitioner, the indebtedness of the Southern Co. to petitioner should be allowed as a deduction under this issue. Neither party filed a reply brief.

The computations of the respondent are based upon a determination that the Southern Co. was liquidated. The petitioner's present theory is consistent with the one advanced in the issue involving the Wofford Co. except for the deduction of the item for advances, and is within the prayers of the petition and amended petition. It has been said that "The relief demanded is gauged by the prayer." Moise v. Burnet, 52 Fed. (2d) 1071. Under that rule, the prayer here would present the general question of whether a profit was realized, and, if so, the amount thereof.

In any event, we think that under the prevailing circumstances our duty is to determine whether petitioner realized taxable gain in the transaction in the amount alleged by the respondent. See Charles L. Coughlin, 15 B. T. A. 515; John I. Chipley, 25 B. T. A. 1103; Houston Lighting & Power Co., 34 B. T. A. 745.

If the petitioner realized income in the form of taxable gain, it was only by reason of a partial or complete liquidation of the Southern Co. As to that point, the facts are in all material respects the same as those involved in the preceding issue, and our decision is that petitioner realized no taxable gain in 1934 from distributions of liquidating dividends by the Southern Co. Under that issue petitioner conceded the receipt of taxable income from the Wofford Co. to the extent that the fair market value of the property transferred exceeded the recited consideration in the transaction. The petitioner's argument here embodies a like concession by admitting taxable gain equal to the difference between the value of the property and advances and the amount of the consideration. The lease was transferred on November 30, 1934, and at the close of the year the amount due petitioner from the Southern Co. for advances was being carried as an account receivable, and, therefore, an asset, of the former. No contention is made, and the stipulated facts do not establish, that the account constituted part of the consideration for the transfer of the lease. Neither does it appear that the account has at any time since the close of 1934 been written off or otherwise eliminated from petitioner's books. Under the circumstances, the item of $71,194.15 may not be used to reduce gain realized by petitioner in the transaction. Accordingly, we hold that the taxable income realized by petitioner in this transaction was $197,958.88,

representing the difference between the fair market value of the assets transferred and the recited consideration therefor, of which $184,505.05 may be included in petitioner's income under Rule 50.

The parties have stipulated that depreciation allowable on the Pinkston lease for 1932 and 1933 should be recomputed on the basis of 1,600,000 net barrels of recoverable oil. This agreement will be reflected in the recomputation of the deficiencies to be made under Rule 50.

*Decision will be entered under Rule 50.*