EILEEN M. HUNTER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

FRANK H. GALEY AND INGE F. GALEY, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 94456, 94632.   Filed April 27, 1965.

*Harry B. Henderson*, for the petitioners.
*Marvin F. Peterson*, for the respondent.

HOYT, *Judge:* The Commissioner determined a deficiency in the 1957 income tax of petitioner Eileen M. Hunter in the amount of $4,311.66 and a deficiency in the 1957 income tax of petitioners Frank H. and Inge F. Galey in the amount of $12,748.14.   In an amendment to his answer in the Galey case respondent alleged that petitioners in that case had a   corrected basis   in   their   remainder   interest   of $22,737.58; this increased the deficiency to $14,150.37.   These two cases were consolidated for trial, briefing, and opinion.

The questions for decision are:

(1) Whether Code section 1033 providing for nonrecognition of gain on certain involuntary conversions of property is applicable to the sales by petitioners of their ranches to the U.S. Government.

(2) Whether the tax bases of the fee simple estates owned by petitioners should be allocated between the life estates retained by them and the remainder interests transferred in determining the gain from the sales of the ranches, and, if so, how the allocation should be made.

Respondent has conceded on brief an overdetermination of the amount of the capital gain in the case of Eileen M. Hunter to the extent of $1,360.80. This concession will be given effect in a Rule 50 computation.

### FINDINGS OF FACT

Petitioners Frank H. and Inge F. Galey are husband and wife residing at Moose, Wyo., and also at Nevis, Leeward Islands, British West Indies. Their last known address at the time of mailing the statutory notice of deficiency was Golden Rock Estate Guest Ranch, Nevis, Leeward Islands, British West Indies. During the year 1957 they were residents of Moose, Wyo., and they filed a joint income tax return for that year with the district director of internal revenue for the district of Wyoming.

Petitioner Eileen M. Hunter resides at Jackson, Wyo. She filed a separate income tax return for the year 1957 with the district director for the district of Wyoming.

All petitioners kept their records and reported their income on the cash receipts and disbursements method and filed their returns on the calendar year basis.

In 1913 the family of Frank H. Galey acquired over 300 acres of land at Moose, Teton County, Wyo. Approximately 16 buildings were subsequently erected on the land and it became known as White Grass Ranch. Up until the sale in 1957 described below, this ranch was operated by the Galey family as a dude ranch for entertainment of paying guests. Horses and cattle were raised. The Galey ranch was located within the boundaries of Grand Teton National Park, and the Galeys and their guests made use of the facilities of the park. The Federal income tax basis of the ranch just prior to its sale in 1957 was stipulated to be $43,408.10.

Petitioner Eileen Hunter and her husband, now deceased, purchased their ranch at Jackson, Teton County, Wyo., in 1946. This ranch was in two parcels, totaling approximately 520 acres, within the boundaries of Grand Teton National Park. The Hunter ranch was used as a residence by the Hunters and also for the raising of cattle. There was a guesthouse on the property. The Federal income tax basis of the ranch to Eileen Hunter in 1957 just prior to its sale was stipulated to be $96,485.

At some time prior to 1957 the U.S. National Park Service adopted a policy of acquiring all privately owned lands within Grand Teton National Park. The park superintendent approached the Galeys and Eileen Hunter to ascertain whether or not they were willing to sell their

ranches. The owners, while perhaps reluctant, considered selling but they wished to retain life estates so that they might keep their ranches during their lifetimes.

The park superintendent in charge at Grand Teton from 1953 to 1960 had appraisals of the ranches made by local appraisers. Using these appraisals and his own considerable expertise on land values in the park,[1] he determined that the fair market value of the Galey ranch was $315,000 and that the fair market value of the Hunter ranch was $343,000. He then submitted a report to his superiors recommending that the United States pay the Galeys $315,000 for their fee simple estate or $165,000 for the remainder interest alone, and that Eileen Hunter be paid $343,000 for her fee simple estate or $310,000 for the remainder interest alone. We do not know what method of attributing value between the respective interests was used.

Petitioners elected not to sell their fee simple interests but preferred to retain life use of their ranch properties. This was acceptable to the Park Service, and in the fall of 1956 petitioners signed contracts to sell their ranches to the United States at the prices set by the superintendent for the remainders, reserving to themselves life estates on specified conditions.

During 1957 the Galeys sold to the United States a remainder interest in their 301-acre ranch for $165,000 and Eileen Hunter sold to the United States a remainder interest in her 520-acre ranch for $310,000. Petitioners retained limited life estates in their respective ranches by specific reservation thereof in the deeds to the United States.[2]

In their income tax returns for 1957 the petitioners reported the gain on the sale of their respective ranches[3] by deducting from the sales proceeds their bases in the entire fee. In neither case was a portion of the total basis allocated to the retained life estate. The Galeys reported a sale on July 9, 1957, at a price of $165,000, a basis for the property sold (after allowance for depreciation) of $43,408.10, and a gain on sale of $121,591.90.[4] Eileen Hunter reported her sale as made

---

[1] The superintendent purchased approximately 4,000 acres of land for Grand Teton National Park in 25 or 30 separate transactions during his 6 years there, and before he was involved with the acquisition of petitioners' ranches he had purchased from 12 to 15 separate parcels of land for the park in the first 3 years of his superintendency there.

[2] The life estates were limited by several specific conditions set forth in the deeds which generally required petitioners to keep, use, and maintain the premises in the same manner and condition during their life tenure, save as the Director, National Park Service, might otherwise consent. Petitioners could not sell, lease, or otherwise dispose of their reserved estates without prior consent of the Director. We do not know exactly when the sales transactions were closed. The Galeys' deed was dated and acknowledged on Dec. 12, 1956, and recorded on Apr. 2, 1957; the Hunter deed was dated, acknowledged, and recorded on July 19, 1957.

[3] The tax returns do not indicate the fact that only remainder interests were sold and that the sellers had retained life estates.

[4] They described the transactions as "Involuntary Conversion of the White Grass Dude Ranch to Dude Ranch Property in Nevis, B.W.I." and they deducted $70,000 described as replacement cost of Dude Ranch, Nevis, British West Indies, from the sale price of $165,000. The "gain recognized," reported on Schedule D as long-term capital gain "Involuntary conversion—per statement attached," was in the amount of $95,000.

in August 1957, at a gross price of $310,000, less cost of $96,485 and expenses of $8,184.50: a gain of $204,630.50. This gain was reported in her Schedule D as a long-term capital gain. The entire basis in the whole fee estate was therefore subtracted by petitioners to compute the gain on the sale of their remainder interests. The respondent allocated the basis of the entire fee estate between the interest sold and the interest retained in proportion to the respective values of these interests at time of sale.

The respondent's allocation of the basis of the Galey ranch of $43,-408.10 between the interest sold and the interest retained in the respective amounts of $22,737.58 and $20,670.52, was proper, reasonable, equitable, and correctly made.

The respondent's allocation of the basis of the Hunter ranch in the amount of $96,485 between the interest sold and the interest retained in the respective amounts of $87,202.20 and $9,282.80, was proper, reasonable, equitable, and correctly made.

OPINION

Undoubtedly, the pioneer spirit descending from fathers and grandfathers who tamed the wild and rugged country that has been their home in Teton County, Wyo., accounts for the hardy zeal with which these taxpayers and their counsel pursue into this Court their complaint of "arrogant usurpation of authority by incompetent and ruthless employees of the Government." However that may be, our zeal must be confined and directed to a proper application of the Internal Revenue Code to the evidence in the record before us no matter how "bureaucratic, arbitrary and dictatorial" the actions of the Commissioner may appear to petitioners.

The issues involved in this case were never precisely made clear by the petitioners. Throughout the trial we had the impression that they did not fully understand the substantive tax law applicable to the sales here in question, and this impression has been confirmed after studying their briefs. They appear to labor under the misapprehension that respondent is seeking to tax them on the sale of their life interest, which is not the case at all.

Petitioners' principal complaint is that the sales of their ranches were not truly voluntary. The Federal Government wanted their land for addition to the park but wished to acquire it without resorting to the power of eminent domain. Petitioners allege that Government "persuaders" carried out a pressure campaign to force landowners within the park into making "voluntary" sales of their ranches. It is alleged that certain long-standing privileges as to use of the park were revoked, restrictions on the use of their own land were imposed, and condemnations were even threatened. Petitioners claim that these pressures diminished the value of their ranches and

left them with no alternative but to sell out. When the Government offered to let them retain life estates, the petitioners agreed to sell remainder interests. Among the considerations which prompted these sales were assurances by the Government that the petitioners would not have to pay real estate taxes during their life tenancy and that the income tax gains on the sales would be limited to sales of the remainder interests and "there would be no tax on the life tenancy."

Petitioners reported their gains by taking the full proceeds from the sale of the remainder interest and subtracting therefrom the basis of the *entire fee simple estate*, making no allocation of basis to the retained life estate. When respondent attempted to make an allocation of the basis between the life estate retained and the remainder interest sold, the petitioners violently objected claiming that this was a violation of the Government's representation that "they did not have to pay any taxes by reason of the reservation of the life estate," and that the Commissioner was merely bent on furthering the harassment and intimidation which allegedly forced them into selling the remainder interests in their ranches to the United States in the first place.

Considerable portions of the trial and of petitioners' briefs were devoted to proving that the sales here involved were involuntary and made under threat of condemnation. Respondent, recognizing that section 1033 of the Internal Revenue Code of 1954 may be applicable here, argues that petitioners have not established that the sales were involuntary nor that replacement properties, similar or related in service or use, were acquired within the specified statutory period. The pertinent statutory provisions are set forth in the margin.[5]  Petitioners nowhere argue that section 1033 is applicable to either of the two sales, although on opening statement petitioners' counsel stated in

---

[5] SEC. 1033. INVOLUNTARY CONVERSIONS.

(a) GENERAL RULE.—If property (as a result of its destruction in whole or in part, theft, seizure, or requisition or condemnation or threat or imminence thereof) is compulsorily or involuntarily converted—

\* \* \* \* \* \* \*

(3) CONVERSION INTO MONEY WHERE DISPOSITION OCCURRED AFTER 1950.—Into money or into property not similar or related in service or use to the converted property, and the disposition of the converted property \* \* \* occurred after December 31, 1950, the gain (if any) shall be recognized except to the extent hereinafter provided in this paragraph:

(A) NONRECOGNITION OF GAIN.—If the taxpayer during the period specified in subparagraph (B), for the purpose of replacing the property so converted, purchases other property similar or related in service or use to the property so converted, \* \* \* at the election of the taxpayer the gain shall be recognized only to the extent that the amount realized upon such conversion \* \* \* exceeds the cost of such other property \* \* \*

\* \* \* \* \* \* \*

(B) PERIOD WITHIN WHICH PROPERTY MUST BE REPLACED.—The period referred to in subparagraph (A) shall be the period beginning with the date of the disposition of the converted property, or the earliest date of the threat or imminence of requisition or condemnation of the converted property, whichever is the earlier, and ending—

(i) one year after the close of the first taxable year in which any part of the gain upon the conversion is realized, or

(ii) \* \* \* at the close of such later date as the Secretary or his delegate may designate on application by the taxpayer. \* \* \*

answer to direct question by the Court that there is an involuntary conversion issue in the case of the Galeys. Petitioners do not cite section 1033 at any point in their two briefs and they have failed to show that the prerequisites to the application of section 1033 have been satisfied. They have not established that the Galeys' converted property was replaced with property similar or related in service or use within the prescribed time or how much they paid for their newly acquired property; further, they have not established *when* the converted property was replaced or the extent to which the amount realized upon the alleged conversion exceeded or was less than the cost of the replacement property.

The joint return filed by the Galeys for 1957 reported replacement cost of dude ranch, Nevis, British West Indies, as $70,000, but at trial Galey testified that the purchase price of "the place" was $165,000, just what he had received for his place (presumably the remainder interest in White Grass Ranch). This conflict was never explained or elaborated upon. We cannot therefore make a finding of how much the replacement property cost. Had the Galeys established by competent evidence that the replacement property was similar or related in service or use, acquired within the time specified in section 1033 and at a cost as much as or more than was realized from the conversion, they might well be entitled to benefit from the nonrecognition provisions of section 1033. They have, however, utterly failed to do so. There is not even a suggestion that Eileen Hunter ever acquired a replacement property of any kind. Therefore, although there is evidence to support petitioners' contention concerning the pressures surrounding their sales to the United States which might justify a finding that the sales here were involuntary and made as a result of threat or imminence of condemnation, we make no finding as to that and deem it unnecessary to make a determination as to whether or not the sales were involuntary conversions. Section 1033 has not been shown to be applicable so as to entitle the petitioners to nonrecognition of their gains, and whether or not the sales were voluntary has nothing to do with the determination of the correct *amount* of gain realized from the sales of remainder interests here involved.

Respondent increased the reported capital gain of petitioners in both of these cases by lowering the reported bases of the interests sold, through allocation of a portion of the fee simple bases to the retained life estates. We stress again that the parties agree on the amount of these bases for the entire properties. For some unknown reason, petitioners are under the impression that respondent is attempting to tax them on a gain which derives from sale of the life interest when the life interests were never sold. Of course, this is a misconception.

Respondent recognizes that no sale of the reserved life estates has taken place and is merely allocating a portion of the fee simple basis to the life estate not for the purpose of determining any gain on the disposition of that interest, but for the purpose of determining the correct amount of gain on the sale of the remainder interests which were in fact sold.

Petitioners, in effect, also argue that respondent should be estopped to assert the deficiencies in question because the Government representatives who negotiated purchase of their ranches informed them that no capital gains taxes would be due because of their reserved life estates. At most the testimony establishes that the only representation regarding capital gains taxes made by agents of the National Park Service in these transactions was that there would be no taxable gain applicable to the life interest retained, i.e., that the gain resulting from the sale of the remainder interest alone would be less than the gain resulting from the sale of the entire fee simple interest. We cannot hold that any estoppel could properly be applied here on the basis of the evidence presented.

Whatever may be petitioners' view of the tax law, or of what respondent may be attempting to do, it is clear that there must be some apportionment of basis in a situation such as is presented by the instant case. Where part of a property is sold there must be an equitable allocation of basis among the parts to determine the gain realized. Sec. 1.61–6(a), Income Tax Regs.; *Welsh Homes, Inc.* v. *Commissioner*, 279 F. 2d 391 (C.A. 4, 1960), affirming 32 T.C. 239; *Perkins* v. *Thomas*, 86 F. 2d 954 (C.A. 5, 1936), affd. 301 U.S. 655.

Neither the Code nor the regulations prescribe a method for allocating a lump-sum basis when the owner of a fee simple interest conveys, inter vivos, a less-than-fee estate. However, the regulations under section 1014 prescribe a method for allocation when a life interest or a remainder interest *acquired from a decedent* is sold. The basis in the entire fee simple estate (as adjusted to the date of the sale) is determined; certain prescribed actuarial tables are then applied to this fee simple basis using the age of the life tenant at the date of the sale, and thus, the fee simple basis is broken down and a portion allocated to each less-than-fee estate according to life expectancies. Sec. 1.1014–5, Income Tax Regs. This method has been approved in at least one case involving an inter vivos sale of a life estate out of property owned in fee simple. *Estate of Johnson N. Camden*, 47 B.T.A. 926 (1942), nonacq. 1943 C.B. 28, affd. 139 F. 2d 697 (C.A. 6, 1944).

In the instant case respondent has made an allocation of the basis in the fee simple estate by using the same ratios as were used by petitioners and the National Park Service in allocating the market value

and selling price of the fee simple estate as between the remainder interest sold and the life estate retained. The Galey ranch had a market value and sales price of $315,000 and the remainder interest was sold for $165,000; the Galeys were willing to accept $150,000 less for their ranch because they elected to retain a joint life estate. The Hunter ranch had a market value and sales price of $343,000 and the remainder interest was sold for $310,000. Eileen Hunter was willing to accept $33,000 less for her ranch because she elected to retain a life estate. The respondent used these same proportions in allocating petitioners' bases for their entire fee interests between the reserved life estates and the purchased remainders. Thus, $165/315$ of the cost basis of the fee simple estate in the Galey ranch was used as the basis for the remainder interest sold and $310/343$ of the cost basis of the Hunter ranch fee simple estate was regarded as the basis of the Hunter ranch remainder sold.

Though possibly somewhat at variance from the method used in *Estate of Johnson N. Camden, supra,* and the section 1014 regulations, respondent's approach appears both logical and reasonable; it seems to produce an equitable result and is easily applied. Neither the 1014 regulations nor the *Camden* case prescribe a method which *must* be used in cases like the instant one involving an inter vivos transfer.

Although we have been referred to no case in which respondent's method was applied to the conveyance of a remainder interest, there is ample authority for its use in analogous cases and administrative issuances involving, for example, sales of leaseholds with reservations of oil payments or of Maryland ground rents, etc. O.D. 1072, 5 C.B. 89; *Columbia Oil & Gas Co.* v. *Commissioner,* 118 F. 2d 459 (C.A. 5, 1941), affirming 41 B.T.A. 38; *Buttram* v. *Jones,* an unreported case (W.D. Okla. 1941, 29 A.F.T.R. 1357, 43–1 U.S.T.C. par. 9359). See also G.C.M. 23623, 1943 C.B. 313.

Petitioners bear the burden of proving error in respondent's determinations. In their preoccupation with their allegations of mistreatment by the National Park Service followed by similar fate at the hands of respondent's representatives, petitioners have not addressed themselves to the question of the allocation of basis. They have made some effort to show that the retained life estates had little or no value, which, if true, would mean that no portion, or only a very small portion, of the fee simple basis should be allocated to the life estate in determining the gains to be taxed. However, petitioners have not established that the values of their fee interests were other than those determined and offered by the Park Service. Given these values and deducting the values which the petitioners themselves accepted in the sales of their remainder interests, the difference is an appropriate evaluation of the life estates retained. We find the evidence of peti-

tioners' witnesses to the contrary unconvincing and insufficient.[6] Respondent ascribed to the basis of the Galeys' ranch remainder interest a value of $22,737.58 and to the basis of the Hunter ranch remainder interest a value of $87,202.20. Petitioners' evidence is insufficient to show that these remainders had any higher bases.

Petitioners have not suggested any alternative to the method of allocation of basis employed by respondent, nor have they shown error in the respondent's method. *John Scott*, 6 B.T.A. 761 (1927), acq. VII-1 C.B. 28. For these reasons respondent's method must be sustained. In so holding we do not intend to be construed as holding that the method employed by respondent in this case is the only proper method of allocation in the case of an inter vivos transfer of a less-than-fee interest out of a fee simple estate. Nor do we intend to hold that the method here approved must always be accepted as a proper method in cases of this type. Since petitioners have not argued that the method prescribed in section 1.1014–5 of the regulations should be applied in this situation, nor have they proved such facts as would be necessary to enable the Court to apply that method of our own initiative, the choice between methods, if one is to be made, must be left to the appropriate future occasion.[7] On the particular facts disclosed by the record of this case we sustain respondent's allocation of bases and determinations as to the computation of the gains realized in 1957 from the sale of petitioners' remainder ranch interests.

*Decisions will be entered under Rule 50.*

---

[6] Various witnesses testified to annual fair rental value of the ranches but nothing was introduced to convert annual rental value into the necessary *present value* of the entire life estate. We have no evidence before us from which we could determine the life expectancy of the petitioners so as to permit a different valuation of the life interests by the use of actuarial tables. It may well be that the determination of value of the remainder interests by the Park Service was reached by using respective ages of the life tenants and factors set forth in actuarial tables; we do not *know* how these values were arrived at, but the fact remains that whatever method was employed, petitioners agreed to accept the offered prices.

[7] It is to be noted that the method used in the instant case will produce the *same* allocation of basis as the 1.1014–5 method in cases in which the selling price of the less-than-fee interest is agreed upon by the seller and buyer by allocation of the market value of the fee simple according to actuarial tables.