## LOMAS SANTA FE, INC., AND SUBSIDIARY COMPANIES: LOMAS SANTA FE COUNTRY CLUB, NORCO LANDSCAPE & MAINTENANCE CO., PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6578–77.    Filed July 9, 1980.

*William P. Shannahan* and *John S. Huiskamp,* for the petitioners.

*Louis A. Boxleitner,* for the respondent.

GOFFE, *Judge:* The Commissioner determined a deficiency in the Federal income tax of petitioners for the taxable year ended July 31, 1973, in the amount of $107,460.76. Due to concessions, one issue remains to be decided: whether an estate for 40 years retained by petitioner Lomas Santa Fe, Inc., is an interest

---

subject to an allowance for depreciation under section 167(a), I.R.C. 1954.[1]

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

Lomas Santa Fe, Inc. (hereinafter Lomas), and its two subsidiary corporations, Lomas Santa Fe Country Club and Norco Landscape & Maintenance Co., filed their consolidated Federal income tax return for the taxable year ended July 31, 1973, with the Office of the Internal Revenue Service, Fresno, Calif.[2] Petitioners, all of which are California corporations, had their principal offices in Solana Beach, Calif., when their petition was filed in this proceeding.

At all times relevant to this proceeding, Theodore E. Gildred (hereinafter Gildred) owned all of the outstanding capital stock of Lomas, was the chairman of the board of directors of Lomas,[3] and was the president of Lomas. Thomas E. Kern (hereinafter Kern) was at all times relevant to this proceeding a member of the board of directors of Lomas and was a vice president of Lomas.

In 1964, Lomas began to formulate a plan for the development of a high quality residential community. The community, which was to be called Lomas Santa Fe, was to be developed on acreage which had been purchased in 1959 from the Rancho Santa Fe Irrigation District. The plan included a neighborhood shopping center, residential units (single-family homes, condominiums, and apartments), and a championship golf course and country club. The development of the golf course and country club was contemplated for two major reasons: first, to enhance the value of the residential properties; and second, to ease the density restrictions imposed by the Rancho Santa Fe Irrigation District.

Gildred had considerable experience as a developer and, based

---

[1] All section references are to the Internal Revenue Code of 1954 as amended.

[2] Norco is a party to these proceedings solely because it joined in the consolidated Federal income tax return for the taxable year ended July 31, 1973; none of the events involved in this proceeding relate to Norco or its activities.

[3] The board of directors of Lomas was comprised of three persons.

upon that experience, he believed that houses which bordered a golf course would be in greater demand and would fetch higher prices than those which did not. Lomas intended that the golf course would be the hub of the residential community of Lomas Santa Fe. It was contemplated that the golf course would attract the higher income residential market and would greatly enhance the value of the lots which would be sold for residential use. The golf course was needed as an amenity to attract potential purchasers of residential properties because Lomas Santa Fe was some distance from the city of San Diego. In addition to the obvious recreational aspects of the golf course, its cart paths would enable residents of Lomas Santa Fe to travel from their homes to the shopping center via electric cart or similar vehicle.

The Rancho Santa Fe Irrigation District imposed strict density limits upon developments within that district.[4] The acreage held by Lomas was within that district, and it accordingly was subject to deed restrictions upon the density of residential development thereon. In 1967, a master plan for the development of Lomas Santa Fe was submitted to the San Diego County Board of Supervisors and to the Rancho Santa Fe Irrigation District, both of which had control over the development of the acreage on which Lomas Santa Fe was to be built. In approving the master plan, the San Diego County Board of Supervisors and the Rancho Santa Fe Irrigation District imposed the condition that an open-space easement on the acreage used for the golf course be dedicated in perpetuity to the county of San Diego.[5] Such an easement was granted, and the master plan was approved. Because of the dedication of acreage for the golf course to open-space use, the Rancho Santa Fe Irrigation District raised the density limits for the remaining acreage, permitting roughly the same number of dwellings to be built on the remaining land as would have been constructed on the total acreage.

The golf course and country club, being a central and

---

[4]Density, as the term is used in this case, means the number of residential properties permitted to be built on a given area of land such as an acre.

[5]Specifically, the easement would cause the area set aside for the golf course to remain perpetually as open space to be used exclusively for golf course, park, and recreational purposes.

dominant feature of Lomas Santa Fe, was to be used as an essential marketing tool and sales vehicle in the offer of residential properties. Lomas did not intend to keep the golf course and country club indefinitely, but rather, intended to dispose of it when its usefulness as a marketing tool expired.

The idea of including a golf course as an integral part of a development community was not novel, but residential development usually preceded the development of the golf course. As a result, the promises of the developer were the most tangible assurance that home buyers would receive concerning the completion of their development community. In contrast, Lomas undertook the development of the golf course in 1967 as the first step in its project to develop Lomas Santa Fe. Gildred was convinced that his marketing approach would produce results superior to those attainable with only the promise of a golf course.

Lomas Santa Fe Country Club (hereinafter Country Club) was organized on November 14, 1968. Country Club was formed to serve as a vehicle for the refinement of title to the residential properties and to ensure that membership in the country club would not constitute an equity interest in Lomas.

On February 11, 1969, Country Club issued 72,869 shares of its capital stock to Lomas in exchange for certain property as described below. The 72,869 shares so exchanged were all of the issued and outstanding shares of stock in Country Club. Lomas was the sole shareholder of Country Club until July 26, 1973, when 21 percent of such shares were sold by Lomas to Gildred. At all times relevant to this proceeding, Lomas controlled the board of directors of Country Club.

On December 2, 1968, at a meeting of the board of directors of Lomas, several resolutions were adopted concerning a sale of the golf course facilities which Lomas had already developed and which Lomas still owned. The resolutions were as follows:

RESOLVED that the officers of [Lomas] are hereby authorized and instructed to offer for sale, and to sell, to Lomas Santa Fe Country Club, in return for shares of capital stock in Lomas Santa Fe Country Club, as of a date certain for evaluation purposes, all of the real property set aside, planned and developed as a Country Club, subject thereto to an estate for 40 years in the property generally known as, and containing thereon, the golf professional shop, the existing clubhouse, the area for the contemplated future clubhouse, and the golf course proper.

RESOLVED FURTHER that in order to insure the control of [Lomas] for future

development of real property in the vicinity of the property on which the golf course is located that there will be specifically excluded from the conveyance to Lomas Santa Fe Country Club, the tenth fairway and the areas known as the east and west parkways, but the use of such tenth fairway shall be granted pursuant to a separate agreement between [Lomas] and Lomas Santa Fe Country Club, or an easement thereon.

RESOLVED FURTHER that [Lomas] will maintain and operate the golf course, bar, dining and related facilities pursuant to its reserved estate for years, and that this corporation will repair, maintain and make improvements upon the golf course, bar, dining and related facilities in consideration for 75% of the membership dues charged by Lomas Santa Fe Country Club for the use of all facilities located upon the subject property.

RESOLVED FURTHER that Lomas Santa Fe Country Club would have administrative control over all of the operations and facilities upon the subject real property hereinabove referred to.

By letter dated December 3, 1968, and pursuant to the foregoing resolutions, Lomas submitted its offer to Country Club. Lomas offered to transfer property valued by Lomas at $728,680.89 and cash of $9.11 in exchange for 72,869 shares of capital stock in Country Club at the par value of $10 per share. In addition to a technical description of the property transferred, Lomas explained and expanded upon its offer in the letter as follows:

You will note that the real property over which the tenth fairway of the golf course is located and those areas known commonly as the east and west parkways are specifically excluded from our proposal. Should you accept the offer herein contained, we will by separate agreement or easement, insure that the operation, repair, maintenance and improvement of the golf course is not hindered by the exclusion of the tenth fairway, said exclusion being so that Lomas Santa Fe, Inc. may have a full supervision over the development of the lands adjacent to said tenth fairway.

You will note that pursuant to the descriptions in the Exhibits attached hereto that the parking lot, tennis court and swimming pool would be granted to Lomas Santa Fe Country Club outright.

Please note that the golf course proper, (subject to the exclusions and either agreement or easement described above), as well as the golf professional shop, the present club house and the parcel of real property upon which it is contemplated that the future club house will be constructed have been reserved by this corporation for a period of forty years.

This corporation would, subject to any future agreements or conveyances, which would act to modify the plan set forth herein, operate the golf course, bar, dining and related facilities during the period of its reserved estate for years, specifically excluding the parking, tennis, swimming and adminstrative facilities and responsibilities. In light of the enormous costs involved in the operation, repair, maintenance and improvement of a golf course facility, we

would require that 75% of the proposed membership dues be collected for our account for that purpose.

It would be further understood and agreed by this corporation that your corporation would operate the parking, tennis and swimming facilities and would have administrative control over the entire operations of all the facilities.

It is contemplated that this corporation would construct at its own cost further improvements and facilities upon the subject real property and would be willing, upon completion of same, to negotiate a value thereon by mutual agreement for which we would accept payment therefor in cash or shares of stock in your corporation.

The assets which Lomas offered to transfer outright to Country Club and the value of those assets were as follows:

| Asset | Value |
|---|---|
| Acreage (7 acres at $8,000/acre) | $56,000.00 |
| Skyline Drive widening | 35,123.99 |
| Sewer | 35,835.73 |
| Tunnel | 37,808.03 |
| Tennis court | 36,837.13 |
| Playground equipment | 718.75 |
| Nursery fence | 775.85 |
| Cash | 9.11 |
| Total | 203,108.59 |

The assets in which Lomas reserved an estate for 40 years, their useful lives, and their value were as follows:

| Asset | Useful Life | Value |
|---|---|---|
| Acreage (60 acres at $8,000/acre) | Unlimited | $480,000.00 |
| Acreage (61.1 acres at $8,000/acre) | Unlimited | 492,800.00 |
| Acreage (1.4 acres at $8,000/acre) | Unlimited | 11,200.00 |
| Main clubhouse | 40 years | 45,148.20 |
| Golf-ball building | 40 years | 696.57 |
| Pool clubhouse | 40 years | 39,488.19 |
| Golf course | Unlimited | 737,692.07 |
| Sprinkler | 15 years | 152,000.00 |
| Pumphouse | 40 years | 11,811.52 |
| Maintenance | 40 years | 40,708.35 |
| Snack bar | Not shown | 69,368.24 |
| Total | | 2,080,913.14 |

The value of the estate for 40 years in those assets was computed by multiplying the value of the assets by a factor of 0.7474275, and the value of the remainder conveyed to Country Club was

computed by multiplying the value of the assets by a factor of 0.2525725.[6] Thus, the value of the estate for 40 years in the foregoing assets was $1,555,331.73, and the value of the remainder was $525,581.41. The value of the assets offered to be transferred outright ($203,108.59) and the value of the remainder interest ($525,581.41) combine for a total offer of $728,690 worth of assets.

On December 17, 1968, at a special meeting of the board of directors of Country Club, the three directors of Country Club, Gildred, Kern, and Kent Staab, unanimously resolved that the offer of Lomas be accepted.[7] In accordance with the agreement between Lomas and Country Club, two corporation grant deeds were prepared. Two deeds dated February 11, 1969, were recorded in the Office of the Recorder of San Diego County on December 3, 1971. One deed grants Country Club the property which was not subject to restriction, and the other deed grants Country Club a remainder interest in the property which was subject to an estate for 40 years.

The cost of the golf course and its landscaping in which Lomas retained an estate for 40 years was $1,151,244.[8] Lomas had a basis in those assets equal to their cost. Petitioners computed the basis that Lomas had in its estate for 40 years in the land and landscaping of the golf course by applying a factor of 0.7474275 to the basis that Lomas had in those assets.[9] Thus, petitioners determined that Lomas had a basis of $855,086 in its estate for 40 years in those assets.

The creation of Country Club solved practical problems of real estate law. Attorneys for Lomas wanted to settle all potential boundary and easement problems prior to the sale of any residential lots. By creating a separate entity to hold the golf course and country club, boundaries between that transferred property and the retained residential property were set accurately. Because the residential property and golf course property were held by different entities, easements for playing rights,

---

[6] The factors came from Internal Revenue Publication No. 11 and are not disputed.

[7] Kent Staab, at that time, was the manager of the country club as well as a vice president of Country Club.

[8] Of the total amount, $413,552 was attributable to the cost of land and $737,692 to the cost of improvements.

[9] This factor came from Internal Revenue Publication No. 11 and is not disputed.

cart paths, and open slopes were negotiated easily and placed on the residential lots with certainty.

The creation of Country Club helped Lomas retain control over its development of Lomas Santa Fe. The opinion of the California Supreme Court in *Silver Hills Country Club v. Sobieski*, 55 Cal. 2d 811, 361 P.2d 906 (1961), raised the possibility that memberships sold by Lomas as owner of the golf course and country club could constitute equity interests in Lomas. As such, the plans for development of Lomas Santa Fe could have been influenced by the members of the country club.

By the time of trial, Lomas had received three offers for the purchase of the golf course and country club. One offer, made in 1974, was an unsolicited offer from a California corporation owned by some of the club members. Another offer, made in 1977, was a solicited offer from a California corporation owned by some of the club members. The third offer was outstanding at the date of trial and was made by a foreign corporation not linked to club members.

In 1973, during a financial audit of petitioners, a certified public accountant noticed that petitioners had not been amortizing the estate for years which was held by Lomas. The assets that are subject to the estate for years fit into two categories: (1) Those which are depreciable assets having a useful life equal to or less than 40 years; and (2) those which have no determinable useful life and are not depreciable assets. Lomas had been claiming depreciation deductions for the assets in the first category because their useful lives would expire prior to or at the same time as the termination of the estate for 40 years. Lomas had not been claiming depreciation deductions for the assets that fit into the second category (land and landscaping) or for the estate for 40 years in those assets.

On their consolidated Federal income tax return for the taxable year ended July 31, 1973, petitioners claimed their usual depreciation deductions in respect of the assets which were depreciable assets having a useful life equal to or less than 40 years, and they also claimed, for the first time, a depreciation deduction due to the amortization of the portion of the estate for

years which represented an interest in the land and landscaping of the golf course. The amount of the latter was $21,377.16.[10] In addition, petitioners modified the computation of their net operating loss carryover to the taxable year ended July 31, 1973, by including an "amortization correction" in the amount of $21,377.16 for the taxable year ended July 31, 1972.

In determining a deficiency in Federal income tax for the taxable year ended July 31, 1973, the Commissioner disallowed the depreciation deduction taken in respect of the estate for years, and he recomputed petitioners' net operating loss carryover, eliminating the "amortization correction" from petitioners' computation. Those two adjustments were made "for the reasons that your investment in the Lomas Santa Fe Country Club does not represent an amortizable or depreciable asset."

### ULTIMATE FINDING OF FACT

The creation of Country Club by Lomas and the retention by Lomas of an estate for 40 years in certain assets transferred to Country Club were motivated by business purposes and must not be disregarded for tax purposes.

### OPINION

As the first step in the development of a luxury community to be known as Lomas Santa Fe, Lomas created a golf course and country club on part of the land that Lomas had designated for development. The golf course and country club were made part of the community for two reasons: first, to enhance the value of the residential properties being developed; and second, to ease the density restrictions imposed by the local irrigation district.

A fully operational golf course and country club having been created, Lomas decided to form a wholly owned subsidiary, Country Club, to hold the golf course and country club property while Lomas developed the residential community. Lomas formed Country Club to separate the golf course and country club from its other assets. Specifically, Country Club was to serve as a vehicle for the refinement of title to the residential

---

[10](Basis - salvage value) ÷ useful life = (855,086 - 0) ÷ 40 = $21,377.15 (1-cent discrepancy with amount claimed).

properties and to ensure that membership in the country club would not constitute an equity interest in Lomas.

Under the facts of *Silver Hills Country Club v. Sobieski*, 55 Cal. 2d 811, 361 P.2d 906 (1961), the California Supreme Court endowed country club memberships with the attributes of securities. In the event that Lomas had not separated the golf course and country club from its other assets, memberships in the country club, which were found to be securities, would have represented a direct interest in Lomas. Such interest could have directly influenced the development of Lomas Santa Fe. By creating a subsidiary to hold the assets of the golf course and country club, any equity interest attributed to members would be a direct interest in Country Club rather than in Lomas. Thus, direct control over the continued development of Lomas Santa Fe was preserved by the interposition of Country Club. Nevertheless, the potential control of Country Club by members could have indirectly influenced the development of Lomas Santa Fe. If members controlled the operation of the golf course and country club through an equity interest in Country Club, the facilities might not have been maintained in the style required for promotion of a luxury residential community. Lomas did not want to jeopardize the value of the golf course and country club as a marketing tool. Therefore, Lomas retained an estate for 40 years in the golf course, bar, dining and related facilities, enabling Lomas to operate those facilities and maintain quality control until the marketing function had been served. The parking, tennis, swimming, and administrative facilities were transferred outright and were to be operated by Country Club. Lomas intended to divest itself entirely of the golf course and country club after its usefulness as a marketing tool ceased.

In 1973, during a financial audit of petitioners, a certified public accountant noticed that petitioners had not been amortizing the estate for years which was held by Lomas. The assets that are subject to the estate for years fit into two categories: (1) Those which are depreciable assets having a useful life equal to or less than 40 years; and (2) those which have no determinable useful life and are not depreciable assets. Lomas had been claiming depreciation deductions for the assets in the first category because their useful lives would expire prior to or at the same time as the termination of the estate for 40 years. Lomas had not been claiming depreciation deductions for the

two assets that fit into the second category (the land and the landscaping for the golf course), because those two assets have no determinable useful lives and thus are not depreciable assets. *Edinboro Co. v. United States*, 224 F. Supp. 301 (W.D. Pa. 1963). After some research, however, it was decided that petitioners would amortize over 40 years the portion of the cost of the estate for years that was allocable to the land and landscaping of the golf course. On their consolidated Federal income tax return for the taxable year ended July 31, 1973, petitioners claimed their usual depreciation deductions in respect of the assets included in the first category described above, and they also claimed for the first time a depreciation deduction due to the amortization of the portion of the estate for years which represented an interest in the land and landscaping of the golf course. In addition, petitioners modified the computation of their net operating loss carryover to the taxable year ended July 31, 1973, by including an "amortization correction" for the taxable year ended July 31, 1972. Thus, petitioners effectively amended their Federal income tax return for the taxable year ended July 31, 1972, because the net operating loss carryover was computed as if they had claimed a depreciation deduction due to the amortization of the portion of the estate for years which represented an interest in the land and landscaping of the golf course.

In determining a deficiency in tax for the taxable year ended July 31, 1973, the Commissioner disallowed the depreciation deduction taken in respect of the estate for years, and he recomputed petitioners' net operating loss carryover, eliminating the "amortization correction" from petitioners' computation. Those two adjustments were made "for the reasons that your investment in the Lomas Santa Fe Country Club does not represent an amortizable or depreciable asset."

In this proceeding, respondent's chief argument is that the transfer of assets by Lomas to Country Club and the retention by Lomas of an estate for 40 years in some of those assets should both be disregarded for tax purposes. Therefore, respondent reasons that for tax purposes, Lomas still owns the transferred assets and holds a direct, nondepreciable fee interest in the land and landscaping of the golf course. Petitioners argue that Country Club was created to fulfill a valid business purpose, that all transactions between Lomas and Country Club fulfilled valid business purposes, that Lomas and Country Club are separate

entities, and that the form of the initial transaction between Lomas and Country Club accurately reflected its substance. Therefore, petitioners reason that the transfer of assets by Lomas to Country Club and the retention by Lomas of an estate for 40 years in some of those assets should not be disregarded for tax purposes. Petitioners then conclude that they properly claimed a depreciation deduction due to the amortization of the estate for years which is held by Lomas.

The crux of respondent's argument is that the manner in which petitioners structured the transfer of assets and retention of an estate for years does not reflect the substance of the transaction. Respondent contends that petitioners are attempting to do indirectly what they cannot do directly, i.e., they are attempting to depreciate land and landscaping, which do not have limited useful lives. Respondent characterizes Country Club as "little more than a shell" and describes the transaction between Lomas and Country Club as a "device." The 100-percent ownership of Country Club by Lomas initially, and by Lomas and Gildred eventually, in conjunction with the 100-percent ownership of Lomas by Gildred, are seen by respondent as evidencing sufficient domination and control by Gildred to consider the two corporations as one and the economic interests of Gildred and the two corporations as inseparable. Respondent argues by way of analogy to the doctrine of merger, contending that when viewed as a whole, Lomas and Country Club were in the same economic position after the transaction as before, and Lomas could, through its control of Country Club, at any time, convey a fee interest in the property subject to the estate for years. Respondent also points out that Country Club had little or no value to potential buyers without the assets in which Lomas held an estate for years. Further, respondent contends that a fatal flaw in petitioners' position is the admitted intention of Lomas to dispose of the golf course and country club after the residential development of Lomas Santa Fe had been completed. As further evidence of the identity of Lomas and Country Club, respondent points out that the agreement which granted Lomas a percentage of membership dues and fees was later altered to give Lomas a greater share of those dues and fees. Finally, respondent argues that the relationship between Lomas and Country Club regarding the maintenance and operation of the golf course and country club is vague and ill-defined.

At the outset of our discussion of this issue, it seems appropriate to note that this is not an attempt by the Commissioner to "distribute, apportion, or allocate gross income, deductions, credits, or allowances" as he is empowered to do under section 482. Instead, the Commissioner has chosen to ignore the corporate entity of Country Club for purposes of taxation and to disregard entirely the initial transaction between Lomas and Country Club.

The test that we must use for deciding whether or not Lomas and Country Club are separate entities for tax purposes was enunciated by the Supreme Court in *Moline Properties, Inc. v. Commissioner*, 319 U.S. 436 (1943):

> The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity. * * *
>
> * * * In general, in matters relating to the revenue, the corporate form may be disregarded where it is a sham or unreal. In such situations the form is a bald and mischievous fiction. [319 U.S. at 438–439; citations and fn. refs. omitted.]

The United States Court of Appeals for the Ninth Circuit, the forum to which this case would be taken on appeal, has adopted the foregoing test for use when deciding whether or not a corporation should be treated as a separate entity. In *O'Neill v. Commissioner*, 271 F.2d 44 (9th Cir. 1959), affg. a Memorandum Opinion of this Court, the following language was used:

> As a general rule, a corporation is to be treated as an entity separate from the individuals who own it. Burnet v. Commonwealth Improvement Co., 287 U.S. 415, 419 [(1932)] * * * , Dalton v. Bowers, 287 U.S. 404, 410 [(1932)] * * * . An exception is recognized and the corporate structure may be disregarded where (1) the purpose of its creation was not a business purpose, and (2) the creation was not followed by any business activity. Paymer v. Commissioner, 2d Cir., 1945, 150 F.2d 334.
>
> On the other hand, where the corporation is created for a business activity or the creation is followed by business activity the corporation must be recognized as a separate entity. National Carbide Corporation v. Commissioner, 336 U.S. 422, 428–429 [(1949)] * * * ; Skarda v. Commissioner, [250 F.2d 429 (10th Cir. 1957)] * * * ; Moline Properties, Inc. v. Commissioner, 319 U.S. 436, 439 [(1943)] * * * . [271 F.2d at 49.]

Both the Supreme Court and the United States Court of Appeals for the Ninth Circuit incorporated alternative tests in

the language of their opinions. The question whether there existed a valid business purpose for the creation of a corporation and the question whether that corporation engaged in business activity after its creation are questions of fact which must be answered in light of all of the facts and circumstances of that case. *Estate of Parshelsky v. Commissioner*, 303 F.2d 14, 21 (2d Cir. 1962), revg. 34 T.C. 946 (1960); *Van Raden v. Commissioner*, 71 T.C. 1083, 1097 (1979), on appeal (9th Cir., Sept. 18, 1979); see *Commissioner v. Wilson*, 353 F.2d 184, 187 (9th Cir. 1965). Based upon the entire record in this case, we have concluded that Country Club was created for a business purpose, that it carried on business activity after its creation, and that its existence as a separate entity must be respected.

Country Club was formed for two reasons: first, to serve as a vehicle for the refinement of title to the residential properties; and second, to ensure that membership in the country club that Lomas had developed would not constitute an equity interest in Lomas. Both are business purposes. Respondent has not questioned the existence of those motives or their reasonableness, and we find that Lomas acted prudently and in its best economic interests.

Country Club was created to solve practical problems of real estate law. Attorneys for Lomas wanted to settle all potential boundary and easement problems prior to the sale of any residential lots. By creating a separate entity to hold the golf course and country club, boundaries between the transferred property and the retained residential property would necessarily be set with accuracy. Because the residential property and golf course property were held by different entities, easements for playing rights, cart paths, and open slopes could be negotiated easily and placed on the residential lots with certainty.

Country Club was created to help Lomas retain control over the development of Lomas Santa Fe. Based upon the opinion of the California Supreme Court in *Silver Hills Country Club v. Sobieski*, 55 Cal. 2d 811, 361 P.2d 906 (1961), Lomas was advised by its legal counsel to form a subsidiary to hold the golf course and country club. That case raised the possibility that memberships sold by Lomas as owner of the golf course and country club might constitute equity interests in Lomas. As such, disclosure of the plans for development of Lomas Santa Fe would have been required by California securities law, and the members of

the country club would have had an opportunity to influence the development of Lomas Santa Fe.

We also note that Country Club is not a mere shell; it actively engaged in business activity after its creation even though Lomas operated a portion of the facilities at the golf course and country club. Moreover, no motive or plan of tax avoidance is apparent in this instance. The formation of Country Club resulted from purely business considerations, and it engaged in business activity after its formation. Both of the alternative tests that were spelled out in *Moline Properties, Inc. v. Commissioner, supra,* and *O'Neill v. Commissioner, supra,* are met in this case, and we respect Country Club as an entity separate from Lomas and from Gildred.

Not only are we convinced that there was a business purpose for the creation of Country Club, but also we find that there was a business purpose for the retention by Lomas of an estate for years in certain assets which were transferred to Country Club in exchange for stock. In essence, Lomas created the golf course and country club to serve as a "loss leader" which would attract home buyers. By its very nature as a "loss leader," it was more important that the golf course and country club enhance the value of residential properties than operate at a profit. As long as Lomas could operate the golf course and country club, that policy could be carried out. If, however, the membership of the country club obtained control over the operation of the golf course and country club,[11] the membership certainly might not be disposed toward operation at a loss, the quality of the golf course and country club could decline, and its value to Lomas as a marketing tool could evaporate. Therefore, to protect the value of the golf course and country club as a marketing tool, it was necessary for Lomas to retain a modicum of operational control over those facilities. Although other methods were considered, retention of an estate for years was chosen as the vehicle by which that objective would be attained. Thus, the transfer of assets by Lomas to Country Club and the retention

---

[11]In light of the opinion of the California Supreme Court in *Silver Hills Country Club v. Sobieski,* 55 Cal. 2d 811, 361 P.2d 906 (1961), we have found that it was prudent for Lomas to anticipate that memberships in the country club might be classified as securities representing interests in the corporation which held the assets of the country club. It would be inconsistent not to take that same consideration into account when analyzing the effect of transferring those assets to Country Club.

by Lomas of an estate for years was motivated by a business purpose, and respondent's characterization of the transaction as a "device" is wholly inappropriate. Therefore, the transaction must not be disregarded. Cf. *Gregory v. Helvering*, 293 U.S. 465 (1935).

We adhere to the foregoing result despite respondent's arguments that Gildred, `Lomas, and Country Club must be viewed as one for purposes of this case. Respondent contends that Lomas and Country Club were both under the domination and control of Gildred and, therefore, the transfer of assets by Lomas to Country Club must be disregarded. To support that contention, respondent cites *Higgins v. Smith*, 308 U.S. 473 (1940); *National Lead Co. v. Commissioner*, 40 T.C. 282 (1963), affd. on this issue, revd. in part on another issue 336 F.2d 134 (2d Cir. 1964), cert. denied 380 U.S. 908 (1965); *Investors Diversified Services, Inc. v. Commissioner*, 39 T.C. 294 (1962), affd. 325 F.2d 341 (8th Cir. 1963); *Bank of America v. Commissioner*, 15 T.C. 544 (1950), affd. per curiam 193 F.2d 178 (9th Cir. 1951); *Crown Cork International Corp. v. Commissioner*, 4 T.C. 19 (1944), affd. per curiam 149 F.2d 968 (3d Cir. 1945). The underpinnings for this line of cases are illustrated by the following language from *Higgins v. Smith, supra:*

If * * * the Gregory case is viewed as a precedent for the disregard of a transfer of assets without a *business purpose* but solely to reduce tax liability, it gives support to the natural conclusion that transactions, *which do not vary control or change the flow of economic benefits*, are to be dismissed from consideration. * * * The purpose here is to tax earnings and profits less expenses and losses. If one or the other factor in any calculation is *unreal*, it distorts the liability of the particular taxpayer to the detriment or advantage of the entire taxpaying group. [308 U.S. at 476–477; emphasis added.]

We acknowledge and embrace the legal principle espoused in *Higgins v. Smith, supra*, and used in all of the foregoing cases, but the facts in those cases are readily distinguishable from the facts here. The cases cited by respondent all involved the deductibility of losses realized by taxpayers on sales of property to their controlled corporations. All of the sales were found to be shams, unreal, or lacking economic significance. The question whether a transaction is a sham, is unreal, or lacks economic significance is one of fact. *Shaw Construction Co. v. United States*, 323 F.2d 316 (9th Cir. 1963), affg. 35 T.C. 1102 (1961). Based on the facts present in this case, we are convinced that the

transaction between Lomas and Country Club, i.e., the creation of Country Club and the retention of an estate for years by Lomas, was not a sham or unreal or lacking in economic significance. Rather, it was bona fide, it had a business purpose, and it substantively changed the flow of economic benefits. The transaction was bona fide because it was valid for purposes of State law, title to the property passing from Lomas to Country Club. As for business purposes, the transaction was carried out in order to refine title to the residential properties, to insulate the assets of Lomas from the country club members, and to protect the value of the golf course and country club as a marketing tool. The flow of economic benefits was changed because the transaction isolated and identified the assets which would be subject to an equity claim by the members of the country club.

Respondent has also cited *Johnson v. Commissioner*, 24 T.C. 107 (1955), affd. 233 F.2d 752 (4th Cir. 1956), cert. denied 352 U.S. 841 (1956), to support his position. Our opinion in *Johnson* was premised upon the same rationale as that of *Higgins v. Smith, supra*. As explained above, that rationale and the facts of this case combine to dictate that we honor the transaction in issue and give it full effect for tax purposes.

Respondent argues further that a fatal flaw in petitioners' position is evidenced by the intention of Lomas to dispose of the golf course and country club after its utility as a marketing tool had ceased. We disagree and view that intent as supportive of petitioners' position. First, the intent to sell confirms our holding that Country Club was created for a business purpose because the prospect of sale is consistent with an intent to settle potential title problems. Second, the intent to sell confirms our holding that the golf course and country club were marketing tools, and our consequent holding that Lomas had a legitimate interest in the quality of those marketing tools and a business purpose in retaining its estate for 40 years. Although respondent argues otherwise, we see no relevance in the fact that a purchaser of the golf course and country club would have to purchase both the estate for years and either the assets of Country Club or Country Club stock in order to obtain a fee interest. That fact only illustrates the effectiveness of the mechanism chosen by Lomas to limit the potential interest of country club members.

Respondent also faults the agreement between Lomas and Country Club, claiming that the relationship between those entities is vague and ill-defined and that subsequent alteration of the agreement evidences a lack of independence between the entities. Based upon the testimony and evidence in this case, we conclude that this complaint by respondent is without foundation. The terms of the agreement were set forth by Lomas in a letter to Country Club dated December 3, 1968, which is set forth in our findings of fact. The terms are straightforward, and alteration of the allocation of dues and fees is contemplated by the portion of the agreement which acknowledges possible "future agreements or conveyances, which would act to modify the plan set forth herein."

Respondent's foregoing arguments were directed solely toward convincing this Court that we should disregard Country Club as an entity separate from Lomas and that we should ignore both the transfer of assets by Lomas to Country Club and the retention by Lomas of an estate for 40 years in certain of those assets. One by one, we have explained why those arguments are without merit. We, therefore, have found as facts that Country Club is an entity separate from Lomas and that neither the transfer of assets by Lomas to Country Club nor the retention by Lomas of an estate for 40 years in certain of those assets may be disregarded for tax purposes.

Thus, Lomas holds an estate for 40 years. Under California law, an estate for years is property. More specifically, an estate for years is a chattel real. Cal. Civ. Code sec. 765 (West 1979). By its own terms, it is an asset with an expiring and determinable useful life of 40 years. The estate for 40 years is held by Lomas for use in its land development business because the golf course and country club constitute the cornerstone of the marketing strategy which has been adopted by Lomas to promote the sale of residential property. Lomas has allocated its basis in the land and landscaping of the golf course and country club between the retained estate for 40 years and the transferred remainder under the method used for valuing such interests for purposes of the gift tax.[12] Thus, the estate for 40 years exhibits all of the

---

[12]See sec. 25.2512–5(c), (d), and (f) table II, Gift Tax Regs. The factors used by petitioners in this case were taken from an extension of table II which appears in Internal Revenue Publication No. 11. A similar extension of table II appears at par. 1209.50, [1977] Fed. Est. &

characteristics of an asset which is subject to an allowance for depreciation pursuant to section 167 and the regulations thereunder.

Neither of the parties has cited any cases which would move our inquiry beyond the issues which are resolved above. Nevertheless, we are faced with the unsettling fact that Lomas apparently has converted a patently nondepreciable asset to one which is depreciable by simply relinquishing part of its interest in that property. After an exhaustive search of case law, we conclude that there are no cases directly on point. There is, however, one case which we find to be persuasive authority for disallowing petitioners' claimed deduction.

In *Georgia Railroad & Banking Co. v. United States*, an unreported case (S.D. Ga. 1963, 11 AFTR 2d 1435, 63–1 USTC par. 9443), revd. 348 F.2d 278 (5th Cir. 1965), cert. denied 382 U.S. 973 (1966), the United States District Court for the Southern District of Georgia was faced with a unique factual situation and a novel legal issue. In 1881, the taxpayer leased its railroad properties, which included assets of and securities issued by two other railroad corporations, to an individual for a term of 99 years. In 1954, with the lease amended but still in force, the taxpayer-lessor distributed to its own shareholders its reversionary interest in 19,180 shares of stock which were among the securities that were covered by the lease. After that distribution, the lessee of the securities continued to be entitled to hold all of the securities during the term of the lease; the taxpayer, as lessor of the assets and securities, was entitled to the lease payments for the remainder of the term of the lease; and the shareholders of the taxpayer, as holders of the remainder interest in 19,180 shares of stock, were entitled to those securities upon expiration of the lease. In other words, the taxpayer had split its bundle of property rights in the 19,180 shares of stock into two parts, one being a retained lessor's interest with its attendant right to lease payments and the other being a transferred remainder interest in the shares of stock themselves.

---

Gift Tax Rept. (CCH). See and compare *Georgia Railroad & Banking Co. v. United States*, an unreported case (S.D. Ga. 1963, 11 AFTR 2d 1435, 63–1 USTC par. 9443), revd. 348 F.2d 278 (5th Cir. 1965), cert. denied 382 U.S. 973 (1966); *C. G. Sloan & Co. v. Commissioner*, 38 T.C. 203, 211 (1962); *Hunter v. Commissioner*, 44 T.C. 109, 115–117 (1965).

Having thus split its property rights in the 19,180 shares of stock, the taxpayer allocated its basis in those shares between the retained lessor's interest and the transferred remainder interest. Using a useful life equal to the remaining lease term, a salvage value of zero, and the applicable allocation of basis, the taxpayer calculated an allowance for depreciation, in respect of its retained lessor's interest in the 19,180 shares of stock, and claimed a depreciation deduction in that amount. The Commissioner disallowed the deduction and, pursuant to refund litigation, the question of deductibility was presented to the United States District Court for the Southern District of Georgia.

The facts in the instant case and those in the *Georgia Railroad & Banking Co.* case are quite similar. In each case, the taxpayer held nondepreciable property, subsequently divested itself of a remainder interest in that property, and attempted to amortize its retained interest in the property. In each case, the retained interest was property held for use in the taxpayer's business, it was assigned a basis equal to a properly allocated portion of the taxpayer's basis in the undivided property, it had a limited and determinable useful life, and it had no salvage value. The transactions which accomplished the two divisions of property were both undertaken for valid business purposes and with no tax-avoidance motives.

Nevertheless, the facts in the instant case are distinguishable from those present in the *Georgia Railroad & Banking Co.* case in two respects. First, in one case, the underlying property was stock; in the other, it was land. Second, in one case, the underlying property was held by a lessee, and the taxpayer retained a lessor's interest after the interest was split; in the other case, the underlying property was held by the taxpayer who retained an estate for years after the interest was split. On the whole, however, we find sufficient factual similarities between the cases to use the *Georgia Railroad & Banking Co.* case as precedential authority on which our decision may rest. The key fact in both cases is the division of property into a retained interest and a transferred remainder.

The District Court held in favor of the taxpayer. *Georgia Railroad & Banking Co. v. United States*, an unreported case (S.D. Ga. 1963, 11 AFTR 2d 1435, 63–1 USTC par. 9443). The decision followed the reasoning that, had the taxayer purchased rather than retained a present interest in property having a

limited useful life, then its cost unquestionably would be amortizable over its useful life. See, e.g., *Bell v. Harrison,* 212 F.2d 253 (7th Cir. 1954). Such reasoning followed the conclusions that the taxpayer's basis in the stock could be allocated between the retained lessor's interest and the transferred remainder, that the retained interest constituted property held for the production of income, and that the retained interest was a wasting asset with a useful life of 25¾ years. In the course of its opinion, the District Court pointed out that the taxpayer's interest in the stock was bifurcated for valid business purposes and that no motive of tax avoidance was present.

Rejecting the legal reasoning but not the findings of fact of the District Court, the United States Court of Appeals for the Fifth Circuit reversed the decision of the District Court. *United States v. Georgia Railroad & Banking Co.,* 348 F.2d 278 (5th Cir. 1965). We find the following paragraph of the opinion of the Court of Appeals to be particularly compelling:

By distributing the reversion in 1954, taxpayer did nothing more than split its bundle of property rights into two parts. We cannot see how this action on its part can result in a depreciable asset where none previously existed, unless it made some additional investment. The rights which the taxpayer retained after the distribution are merely a fragment of the total bundle of nondepreciable property rights which the taxpayer had before the distribution. The taxpayer has obtained no asset which it did not have in 1913. While similar property might constitute a depreciable asset when acquired separately from the reversionary interest in the shares themselves and while a portion of the total tax basis of the shares can reasonably be allocated to the retained interest, the mere fact that a basis exists on the taxpayer's books and that the property is exhaustible does not alone confer depreciability. While there need not always be a *cost* to the taxpayer in order to permit a depreciation deduction, we think in the present circumstances the taxpayer is required to show the acquisition of property in which he has some separate investment before he can claim a depreciation deduction. See Detroit Edison Co. v. Commissioner of Internal Revenue, 319 U.S. 98, 63 S.Ct. 902, 87 L.Ed. 1286 (1943). Depreciability cannot be conferred merely by the voluntary, gratuitous division of its nondepreciable property into two segments, one of which becomes, as a result of the separation, wasting solely by reason of lapse of time. * * * [348 F.2d at 288–289; fn. refs. omitted.]

As we see it, the Court of Appeals has enunciated a logical and useful rule. It will be called into play only when a nondepreciable asset is divided into two parts, one of which is kept and one of which is given up. In that case, the retained interest will not be considered a depreciable asset even though the purchase of a

similar interest would result in its depreciability. The foregoing rule does not mean that the basis of the underlying property may not be allocated between the retained and transferred interests; the rule simply disallows the depreciation or amortization of that basis. We have followed this course in the past. *C. G. Sloan & Co. v. Commissioner*, 38 T.C. 203, 211 (1962). The rule does allow for the depreciation of additional costs which are incurred in the acquisition of the interest as distinguishable from the acquisition of the underlying property. See *Commissioner v. Moore*, 207 F.2d 265, 273–276 (9th Cir. 1953), cert. denied 347 U.S. 942 (1954).

At the point where we digressed from the decision of the instant case to discuss the *Georgia Railroad & Banking Co.* case, we had just decided that the estate for years held by Lomas was property, was held by Lomas for use in its trade or business, had a determinable basis, and had a useful life of 40 years. Thus, petitioners have made out a prima facie case for the allowance of a depreciation deduction in respect of the estate for years.

Had Lomas purchased the estate for years from a third party rather than retained it as part of the creation of Country Club, its depreciability would be unquestioned.[13] See, e.g., *Bell v. Harrison*, 212 F.2d 253 (7th Cir. 1954), and *Keitel v. Commissioner*, 15 B.T.A. 903 (1929) (purchase of life estate); *1220 Realty Co. v. Commissioner*, 322 F.2d 495 (6th Cir. 1963), and *Atterbury v. Commissioner*, 1 B.T.A. 169 (1924) (purchase of lease). Nevertheless, we hold, as did the United States Court of Appeals for the Fifth Circuit, that the retention of an interest which was created by a division of property is distinguishable from the purchase of similar interest. Accordingly, the foregoing cases which were decided on the basis of purchased interests and other cases similarly premised do not control the outcome of this case.

Instead, we will follow the approach of the United States Court of Appeals for the Fifth Circuit and examine the property

---

[13]Whether we characterize the creation of the estate for years as an exception or a reservation under California law, Lomas did not purchase the estate for years from Country Club within the meaning of the cited cases. Pursuant to the teaching of *Willard v. First Church of Christ, Scientist, Pacifica*, 7 Cal. 3d 473, 498 P.2d 987 (1972), we are of the opinion that Lomas never relinquished the part of its interest which became the estate for years. Nevertheless, even if Lomas did transfer its entire interest in the property to Country Club, and an estate for years was then vested in Lomas, for purposes of this case, the estate for years would merely constitute boot to Lomas in the sec. 351 transaction by which Country Club was created. Neither instance is a purchase within the meaning of the cited cases.

which was divided to create the retained estate for years. Cf. *Gulfstream Land & Development v. Commissioner*, 71 T.C. 587 (1979). The land and landscaping of the golf course did not have limited useful lives when held by Lomas and, therefore, were nondepreciable assets. The separation of that property into two interests, namely a retained estate for 40 years and a transferred remainder, does not transform either part of the whole into a depreciable asset. Lomas is not entitled to amortize its basis in the estate for 40 years because the estate for 40 years is not an asset which is subject to an allowance for depreciation under section 167(a). *United States v. Georgia Railroad & Banking Co.*, 348 F.2d 278 (5th Cir. 1965), cert. denied 382 U.S. 973 (1966). Nor has Lomas proved that it made any separate investment in the retained estate for 40 years which may be recouped through depreciation deductions.

To reflect the foregoing and concessions by the parties,

*Decision will be entered under Rule 155.*